**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALIEGH DIVISION**

| | |
|---|---|
| UNITED SOVEREIGN AMERICANS, INC.<br>167 Lamp and Lantern Village<br>Suite 194<br>Chesterfield, MO 63017 | CIVIL ACTION |
| *And* | |
| RICHARD YOST<br>3652 Jordan Circle<br>Franklinton, NC 27525 | Case No.: _____ |
| *Petitioners,* | |
| v. | |
| NORTH CAROLINA STATE BOARD OF<br>ELECTIONS<br>P.O. Box 27255<br>Raleigh, North Carolina 27611 | |
| *And* | |
| JOSH STEIN, IN HIS OFFICIAL<br>CAPACITY AS THE ATTORNEY<br>GENERAL OF NORTH CAROLINA<br>114 W Edenton Street<br>Raleigh, North Carolina 27603 | |
| *And* | |
| MERRICK GARLAND, IN HIS OFFICIAL<br>CAPACITY AS ATTORNEY GENERAL OF<br>THE UNITED STATES<br>950 North Carolina Avenue NW<br>Washington DC 20530 | |
| *Respondents.* | |

## PETITION FOR RELIEF IN THE FORM OF A WRIT OF *MANDAMUS* [1]

*TO: The Honorable, the Judges of Said Court:*

United Sovereign Americans, Inc., is a Missouri nonprofit corporation; Richard Yost is a North Carolina resident – and registered voter, Petitioners, by counsel, van der Veen, Hartshorn, Levin, & Lindheim, through Bruce L. Castor, Jr., Esquire, hereby submit this Petition for Relief in the Form of a Writ of *Mandamus*, directed to Respondents the North Carolina State Board of Elections, Josh Stein, in his individual capacity as Attorney General of North Carolina, the North Carolina Office of the Attorney General, and Merrick Garland, in his official capacity as Attorney General of the United States.

*Respectfully Represents*:

## SUMMARY OF PETITIONERS' ARGUMENT AND EXAMPLES OF RELIEF REQUESTED

1. The Congress of the United States has outlined the minimum standards which must be maintained by every state in order for a federal election to be considered reliable. As outlined below, in North Carolina's 2022 federal election those minimum standards were not met by State election officials rendering the certified election results that year unreliable. Respondents in their official capacities have engaged in insufficient efforts to ensure that the 2022 performance is not repeated in subsequent federal elections beginning in 2024.

2. If the 2022 election performance is repeated in 2024, Petitioners and all North Carolina voters will suffer damages.

---

[1] Petitioners are cognizant of Federal Rule of Civil Procedure 81(b) which abolished mandamus actions in United States District Court, but nonetheless authorizes "relief previously available through [writs of mandamus] by appropriate action or motion under these rules." F.R.C.P. 81(b). Petitioners herein are seeking relief via the All Writs Act (§ 1361) and an Action to Compel a United States Officer to Perform His/Her Duty (§ 1361).

3. Apart from Court action in equity, no other mechanism exists in the law for Petitioners to require Respondents to perform their ministerial duties requiring that North Carolina's federal elections be conducted in conformity with the law as Congress has set forth.

4. Only this Honorable Court has the power to require Respondents to act to bring the 2024 (and subsequent) federal elections supervised by North Carolina authorities into conformity with the minimum standards for reliability set down by Congress and outlined *infra*.

5. Without the Court's action, Petitioners believe and therefore aver that the 2024 (and subsequent) North Carolina federal election results will be unreliable in the same way, and thus unreliable for the same reasons, that the 2022 results are unreliable.

6. Petitioners seek this Court's intervention to ensure that only votes properly cast are counted in combined federal and North Carolina elections beginning in 2024.

7. Petitioners seek this Court's intervention to ensure that all votes properly cast are counted *correctly* in combined federal and North Carolina elections in even numbered years beginning in 2024.

8. Petitioners seek this Court's intervention to ensure that all voting systems are compliant with all critical infrastructure requirements and risk assessments are completed within the actual use context, thereby assuring that every ballot is correctly and uniformly processed, as well as accurately tabulated and secured in combined federal and North Carolina elections beginning in 2024.

9. Petitioners seek this Court's intervention to ensure that the authenticity of every ballot counted is proven by the maintenance of a comprehensive, unbroken chain of custody from the voter's hand to the final certified result, and the State election officials maintain records of

said chain of custody post-election, in compliance with all legally prescribed safeguards in combined federal and North Carolina elections beginning in 2024.

10.    Petitioners seek this Court's intervention to ensure that combined federal and North Carolina elections in even numbered years beginning in 2024 are conducted with the transparency required by law.

11.    Petitioners seek this Court's intervention to ensure that only votes properly cast are counted in combined federal and North Carolina elections beginning in 2024.

12.    Petitioners seek this Court's intervention clarifying and ordering that the currently accepted Federal definition "to certify" is *to attest that an official measurement is both accurate and the finding of accuracy was reaching in a fully compliant manner*, thereby, directing that the "certification of elections" by State election officials of combined federal and North Carolina elections from 2024 onward constitutes an "attestation," ostensibly under penalty of perjury, by the certifying official(s), that the vote counts are accurate, and the cast and counted votes, and the election itself, were all conducted in compliance with applicable federal and state law.

13.    Petitioners, upon review of the statutes cited below, believe and therefore aver that federal and state law specifies what State officials must conform to, *at a minimum*, to properly conduct a combined federal and state election and prior certifying that election.

14.    Petitioners believe and therefore aver that based on the analysis below, combined with the various exhibits attached to this petition and incorporated by reference herein, that in the 2022 combined federal and state election, officials of the State of North Carolina failed to ensure that **safeguards** were in place as mandated by various statutes designed to ensure the integrity of the elections.

15. Petitioners believe and therefore aver the failure by State election officials to know of and implement the safeguards required by law in 2022 allowed State election officials to certify that election despite analysis showing the election results were *per se* unreliable on account of apparent error rates exceeding those the law permits before the results in *any* federal election becomes unreliable.

16. Petitioners believe and therefore aver that apparent error rates that exceed the maximum error rate allowed by law destroyed the integrity of the 2022 election making full confidence in the accuracy of that election impossible.

17. While Petitioners cannot state with certainty that the 2022 North Carolina General Election produced "winning" candidates who should not have won, Petitioners believe and therefore aver that North Carolina officials cannot state with certainty that all "winning" candidates received more votes than their "losing" candidates because the election itself was compromised by the State's failure to conform to the requirements of federal law designed to ensure reliable election results.

18. Petitioners believe and therefore aver that Congress mandated the maximum number of election errors which were permissible in the 2022 combined federal and state elections in the State (and, indeed, in all states and voting territories). An error rate above the maximum permissible rate set by Congress renders an election *uncertifiable* because such results are *per se* unreliable. Nevertheless, State officials certified the 2022 election.

19. Petitioners do not seek relief in this Court in a challenge to the outcome of the 2022 federal election in North Carolina. Petitioners agrees that it is possible that in every federal contested election supervised and certified by the State in 2022 the "winner" received more votes than the "loser."

20.     Petitioners believe and therefore aver, however, that the certification by North Carolina officials of the 2022 election was done despite the integrity of the election being suspect on account of *apparent* error rates occurring in that election that exceeded the error rate Congress permits before federal election results cannot be relied upon as accurate, and the State did nothing to investigate those apparent errors before certifying the election.

**21.     Petitioners believe and therefore aver that it is reasonable to believe that systemic issues which occurred in the 2022 combined federal and state election in North Carolina will continue uncorrected in 2024, 2026, 2028, and so forth, absent intervention by this Court.**

22.     Petitioners believe and therefore aver that they have called the various issues with the 2022 election to the attention of State officials who failed to take sufficient action to ensure no further repeats of those issues cited here affecting the integrity of the 2022 election.

23.     The relief requested by Petitioners in the form of a Writ of *Mandamus* seeks, broadly speaking, this Court order Respondents to perform the *ministerial* functions their jobs require by taking actions to rectify reliability issues evident in the 2022 election.[2]

## 2022 COMBINED FEDERAL AND STATE ELECTION IN NORTH CAROLINA PRODUCED UNRELIABLE RESULTS AND SHOULD NOT HAVE BEEN CERTIFIED

24.     In the Help America Vote Act ("HAVA") 52 US.C.A. § 21083, **Congress has mandated as follows: HAVA - voting system error rate "…(5) Error RATES.—The error rate of the voting system in counting ballots (determined by taking into account only those errors which are attributable to the voting system and not attributable to an act of the voter) shall comply with the error rate standards established under section 3.2.1 of the**

---

[2] Petitioners does not request this Court order Respondents to exercise their *discretion* or make *any* decision at all apart from enforcing the specific, non-discretionary, requirements of the law outlined, *inter alia,* below.

**voting systems standards issued by the Federal Election Commission ("FEC") which are in effect on the date of the enactment of this Act."**

25.     Congress enacted, and President Bush signed HAVA into law, in 2002 and it remains the law of the United States to date.

26.     The voting standards of the FEC in effect at the time Congress enacted HAVA in 2002 were the Voting Systems Standards Volume I: Performance Standards (2002).[3]

27.     **Those voting standards, in effect at the time HAVA became law, allowed for one error per 500,000 ballot *positions*.**

28.     Petitioners believe and therefore aver that a federal election that exceeded an error rate of one error per 500,000 ballot *positions* renders a federal election unreliable under HAVA.

29.     As the HAVA provision enacted in 2002 cited above has not changed, the error rate of one error per 500,000 ballot *positions* is currently the law of the United States.

30.     A "ballot *position*" refers to the number of individual "choices" a voter could make on a single ballot.  For example, if a particular ballot has thirty little circles for the voter to fill-in or not fill-in, that single ballot would be said to contain thirty ballot *positions*.

31.     A voting *system* error occurs anytime the voting scanning machine should have discerned an error, not made by the voter, while counting one of those ballot positions on a scanned ballot.

32.     Experts working for the FEC estimated that 500,000 ballot *positions* equaled 125,000 *individual ballots*. (*See* Federal Election Commission Voluntary Voting System

---

[3] As of 2021, there have been five iterations of national level voting system standards. The Federal Election Commission published the first two sets of federal standards in 1990 and 2002 (VSS1990 and VSS2002). The Election Assistance Commission then adopted Version 1.0 of the Voluntary Voting System Guidelines (VVSG 1.0, or VVSG2005) on December 13, 2005. On March 31, 2015, the EAC commissioners approved VVSG 1.1 (VVSG2015). On February 10, 2021, the EAC approved VVSG 2.0 (VVSG2021).

Guidelines of 2015, *U.S. Federal Election Commission FEC*. United States [Web Archive]

Retrieved from the Election Assistance Commission,

https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf)

33.     Petitioners believe and therefore aver that the FEC desired to clarify the meaning

of 10 million ballot *positions* in terms of how many individual ballots "make-up" 500,000 ballot

*positions* in order to make easier understanding the election "error rates" permissible by HAVA,

giving state election officials an easier metric with which to work in discerning how many errors

at a maximum are permitted in any given election before that election becomes unreliable and,

thus, uncertifiable.

34.     Petitioners believe and therefore aver (and will present expert testimony to so

substantiate) that the calculation made by the FEC that 500,000 ballot positions represents

125,000 individual ballots is correct and constitutes a proper interpretation of federal law and

Congressional intent under HAVA.

35.     In the 2022 North Carolina General Election, 3,789,810 individual ballots were

recorded by election officials as cast.

36.     For the 2022 General Election, then, if 3,789,810 (ballots cast) is divided by

125,000 (because the law allows for one error per 125,000 ballots), that leaves thirty-one (31),

rounded up, as the maximum number of errors permitted under federal law for the 2022 election.

Only upon a showing of 31 or fewer errors, then, would HAVA permit State election officials to

certify the 2022 election as valid.

37.     If there were more than thirty-one (31) voting system errors in the entire ballot

tabulation for all ballots cast in the 2022 election in North Carolina, the election results are

unreliable.

38. North Carolina exceeded this benchmark of thirty-one (31) voting system errors in the 2022 General Election as outlined below.

39. Petitioners believe and therefore aver that contributing to the unreliability of the State's 2022 election is the fact that North Carolina's voter registration rolls, themselves, contained *hundreds of thousands* of *potential* errors at the time of the 2022 General Election.

40. These potential errors were in the form of illegal duplicate registrations, voters with invalid or illogical voter history, voters placed in inactive statuses on questionable authority, backdated registrations, registrations with a modified date prior to registration, invalid or illogical registration dates, age discrepant registrants, and registrants with questionable addresses.

41. Such errors jeopardize the validity of elections throughout the State, bring doubt as to the accuracy and integrity of the State's currently-in-place voting systems, undermine North Carolinian's collective voting rights, all in violation of existing state and federal election laws.

42. Petitioners seek redress from these voter registration apparent errors, relief from blatantly inaccurate voter registration rolls, relief from discrepancies between votes cast and actual votes reported, and relief from extreme voting errors generally, which collectively and historically amount to violations of federal election laws, North Carolina election laws, and various voting rights encompassed by the United States Constitution.

43. The aforesaid violations of federal and state law have in the past resulted in the certification of election results from provably flawed, inaccurate, and obscure processes outside the view of impartial witnesses or the public, and Respondents have refused collectively to maintain or enforce compliance with federal and state required transparency mandates.

44.     Petitioners has brought this issue to the attention of Respondents, who have done absolutely nothing to address these errors, ensuring future elections will suffer from the same deficiencies.

45.     Furthermore, rather than be alarmed by these apparent errors pursuant to prevailing election laws, Respondents instead have collectively ignored the issue of the unreliable election results therefore produced.

46.     Petitioners believe and therefore aver Respondents have failed to adequately police and monitor problems with the voter rolls and failed to adequately fix voting registration errors within the State, despite being in the best position to ensure the reliability, integrity, and accuracy of North Carolina's elections to ensure veracity of the State's election results.

47.     Petitioners has repeatedly made good faith and sincere efforts to negotiate and convince Respondents to respond to its concerns.

48.     Petitioners has repeatedly shown Respondents evidence of potential violations of election law, regarding the conduct of elections by local and state officials charged with administering elections, on behalf of all citizens in accordance with the law.

49.     The risk of election subversion is indisputable, but the State has denied Petitioners a fair hearing, despite the serious nature of Petitioners' findings calling into question the reliability, integrity and accuracy of prior federal elections administered by the State.

50.     The prayer for relief seeks the protection of Petitioners' rights, as well as those of every voting citizen of the State, to have their vote fairly counted in an open and reliable election as such elections are defined according to law as outlined below.

51.     Respondents have denied Petitioners' members their right to a fair vote.

52.     Furthermore, Respondents appear to have followed procedures that have obscured the ability to audit the 2022 general election to render the outcomes factually unknowable at the time of certification.

53.     Petitioners believe and therefore aver Respondents have violated multiple federal and state laws, or negligently allowed such violations to occur, while loudly proclaiming the infallibility of the State's election results.

54.     Respondents insist that Petitioners has adequate voting rights, while simultaneously fighting from every conceivable angle to prevent Petitioners from attempting to protect those rights. Respondents' collective actions in refusing to address the problem extinguish and undermine the very meaning of the right to vote in a fair representative democracy.

55.     Respondents can and should be compelled to address compliance with existing election law. Specifically: compelled to adequately investigate the issue, prosecute anyone in violation of federal and/or state law, and actively work to bring the State back into compliance with federal and state election law mandates so that North Carolina's constitutionally enshrined voting rights are upheld and preserved.

56.     The All-Writs Act, 28 U.S.C. § 1651 provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in the aid of their respective jurisdictions and agreeable to the usages and principles of law."

57.     District Courts of the United States have original jurisdiction over any action in the nature of *mandamus* to compel an officer or employee of the United States or any agency thereof to perform a duty owed to a plaintiff. 28 U.S.C. § 1361.

## PARTIES

58.     United Sovereign Americans, Inc., is a nonprofit corporation incorporated in the state of Missouri.

59.     Richard Yost is an individual and citizen of North Carolina residing in Granville County, North Carolina.

60.     The North Carolina State Board of Elections is a government entity responsible for administering and ensuring the State's compliance with North Carolina's Election Code and the State's compliance with federal law including the Help America Vote Act, and the National Voter Registration Act.

61.     Josh Stein, in his Official Capacity as the Attorney General of North Carolina, is responsible for overseeing and managing the Office of the Attorney General of North Carolina which is a government agency tasked with the enforcement and prosecution of state law in addition to ensuring that state actors, including those acting within the North Carolina Department of State, are complying with North Carolina law.

62.     Merrick Garland, in his Official Capacity as the Attorney General of the United States, is the chief law enforcement official of the United States, and is responsible for overseeing and managing the Department of Justice of the United States which is a government agency tasked with the enforcement and prosecution of federal law in addition to ensuring that state and federal actors, including those acting in the various states within the United States, are complying with Federal law.

## JURISDICTION AND VENUE

63.     This Court has jurisdiction pursuant to 28 U.S.C. § 1651.

64.     This Court has jurisdiction pursuant to 28 U.S.C. § 1361.

65.     This Court additionally has subject matter jurisdiction over this complaint because the case presents substantial questions of federal law, and the state claims are so related to the federal claims that they form part of the same case or controversy. 28 U.S.C. §§ 1331 and 1367.

66.     This Court has personal jurisdiction as the Respondents are a collection of State of North Carolina agencies and actors, and the State of North Carolina is within the jurisdiction of the United States.

67.     "When a state exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right." *Gray v. Sanders*, 372 U.S. 368 (1963); *Gomillion v. Lightfoot*, 364 U.S. 347 (1960).

68.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1).

## STANDING

69.     Petitioner Richard Yost is a North Carolina resident and voter who possesses intimate knowledge of both North Carolina election laws and information technology management; he is currently the Chief Judge of Elections for Granville County, North Carolina, he has voted in every general election in the State since 2010 to present, and is an executive-level manager of all information technology aspects for United Sovereign Americans with a focus on the analytics of state databases throughout the USA.  A true and correct copy of Richard Yost's Curriculum Vitae ("CV") is attached hereto as **Exhibit** "**D**."

70.     Petitioners extracted data from North Carolina's statewide voter registration database and uncovered numerous registration and voting violations. In particular, Petitioners discovered that for the 2022 election:

a.      3,133 votes were cast by voters with illegal duplicate registrations;

b. 1,130 votes were cast by voters with confirmed illegal duplicate registrations;

c. 4,414 votes were cast by voters whose registrations lacked complete information or were defective;

d. 12,638 votes were cast by voters whose registration date was backdated;

e. 157 votes were cast by voters who registered after the deadline;

f. 12,584 votes were cast by voters whose registrations had altered birthdates;

g. 472 votes were cast by voters who were registered as being older than 111-years-old;

h. 27,880 votes were cast by registered voters who were underage;

i. 1,343 votes were cast by voters whose registrations had altered statewide voter registration numbers;

j. 207,195 votes were cast by voters who were registered on a state holiday or weekend;

k. 51,279 votes were altered;

l. 47,206 votes were cast by registered voters whose address was not verified;

m. 16 votes were cast where a unique voter ID made multiple votes;

n. 209,718 votes were cast by voters who had neither a social security number nor driver's license on file with the North Carolina State Board of Elections.

o. 331 votes had the records of who cast it removed.

71. There is active litigation in this State concerning Respondent North Carolina State Board of Elections' failure to conduct certain voter registration list maintenance in compliance with State election law. As stated in the lawsuit, NCSBE ***admitted*** that it failed to comply with the Help America Votes Act ("HAVA") (emphasis added). *See North Carolina Republican Party*

*et al. v. North Carolina State Board Of Elections, et al.*, State of North Carolina Wake County Superior Court, Case No. 24CV026820-910.[4]

72.     Petitioners have been and are currently harmed by the State of North Carolina voting systems presently and formerly in use in the State of North Carolina state and federal elections. Respondents have allowed, and continue to allow, violations of federal election laws, North Carolina election laws, the United States Constitution, and federal civil rights laws pertaining to voter rights.

73.     The violations of State of North Carolina election laws, federal election laws, the U.S. Constitution, and federal civil rights laws pertaining to voter registration rolls, transparency, compliance, and certification of the voting systems, and the serious issues hereinafter discussed with the overall voting systems exemplify Petitioners' injury.

74.     The injury to Petitioners and all North Carolina voters would cease to exist, or be greatly relieved, if the Court grants Petitioners' requested relief.

75.     The Supreme Court has indicated that if one party to a lawsuit has standing, other entities can join as parties without having to independently satisfy the demands of Article III, provided those parties do not seek a distinct form of relief from the party with standing. *E.g., Horne v. Flores*, 557 U.S. 433 (2009).

## BACKGROUND

### A.     THE CONSTITUTIONALLY PROTECTED RIGHT TO VOTE

76.     The United States Constitution grants the people the right to choose their representatives from among the people of the several states, according to the voting eligibility requirements of the state. U.S. Const. art. 1, § 2.

---

[4] This Court may take judicial notice of the state court proceedings under Fed. R. Evid. 201.

77. The 14th Amendment of the United States Constitution, Section 1, defines a "citizen" as all people born or naturalized in the United States and subject to the jurisdiction thereof.

78. The 14th Amendment of the United States Constitution, Section 2, protects eligible citizen voters against denial or abridgment of their vote.

79. "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury v. Madison*, 1 Cranch 137, 5 U. S. 163 (1803).

80. Federal courts regard the right to vote in a fairly conducted election as a constitutionally protected feature of United States citizenship. *Reynolds v. Sims*, 377 U.S. 533 (1964).

81. After the 2020 Presidential Election, pervasive discussion reported on by the media focused on the validity of the presidential election results within the State of North Carolina.

82. Discussions and/or litigation in North Carolina, as well as in other states around the Nation, centered on whether raw vote totals were accurate, with particular attention focused on the question: if all ballots in dispute were decided, hypothetically, in the favor of one candidate for president over the other, would that have *changed the outcome* of the election in that state?

83. That questions concerned whether the recorded vote totals, viewed in the light most favorable to the losing candidate in any given state, *could* have affected the awarding of electoral votes from said state, which, in turn, *might* have affected the determination of the "winner" of the elections for president and vice-president in the Electoral College.

84.     The media widely reported that no court ruled that, even if all disputed ballots were assumed to have been found to be favorable to the Republican Candidate during the 2020 presidential election, the outcome in any disputed state would have been affected. Furthermore, there was insufficient evidence produced such that a court could find that the outcome of the election in any disputed state was unreliable.

85.     Petitioners do not seek to revisit the results of the 2020 presidential election, nor to re-examine the conclusions drawn by the various courts and media outlets as summarized at averment 87 above.

86.     Petitioners posit a different question than that noted in averment 87: ***How many disputed ballots found to be improperly cast in any given federal election may occur before the reliability and integrity of the entire election becomes suspect?*** Petitioners respectfully represent that Congress has answered this very question as outlined further below and Congress' answer to this question forms much of the basis of the instant Petition.

87.     In *In re: Coy*, 127 U.S. 731 (1888), the United States Supreme Court held that Congress had authority under the Constitution's Necessary and Proper Clause to regulate any activity during a mixed federal/state election that exposed the federal election to potential harm, whether that harm materialized or not. Coy is still good law throughout the country. *United States v. Slone*, 411 F.3d 643, 647 (6th Cir. 2005); *United States v. Mason*, 673 F.2d 737, 739 (4th Cir. 1982); *United States v. Malmay*, 671 F.2d 869, 874–75 (5th Cir. 1982).

88.     In *Oregon v. Mitchell*, 400 U.S. 112 (1970), the Supreme Court stated:

"The right to vote is, of course, different in one respect from the other rights in the economic, social, or political field which, as indicated in the Appendix to this opinion, are under the Equal Protection Clause. The right to vote is a civil right

deeply embedded in the Constitution. Article I, § 2, provides that the House is composed of members 'chosen . . . by the People' and the electors 'shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.' The Seventeenth Amendment states that Senators shall be 'elected by the people.' The Fifteenth Amendment speaks of the 'right of citizens of the United States to vote' -- not only in federal but in state elections.

* * *

[T]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. This 'right to choose, secured by the Constitution,' *United States v. Classic*, 313 U. S. 299, is a civil right of the highest order. Voting concerns 'political' matters; but the right is not 'political' in the constitutional sense. Interference with it has given rise to a long and consistent line of decisions by the Court; and the claim has always been upheld as justiciable . . . as the right in the people of each State to a republican government and to choose their Representatives in Congress is of the guarantees of the Constitution, by this amendment a remedy might be given directly for a case supposed by *Madison*, where treason might change a State government from a republican to a despotic government, and thereby deny suffrage to the people."

89.     The Supreme Court further stated: "we are cautioned about the dangers of entering into political thickets and mathematical quagmires. Our answer is this: a denial of constitutionally protected rights demands judicial protection; our oath and our office require no less of us." *Reynolds v Sims*, 377 U.S. 533 (1964).

90.     "Every voter in a federal . . . election . . . whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, *without its being distorted by fraudulently cast votes*." *Anderson v. United States,* 417 U.S. 211, 227 (1974) (emphasis added).

## B.     NATIONAL VOTER REGISTRATION ACT ("NVRA")

91.     The National Voter Registration Act ("NVRA") was passed for the purpose of ensuring accurate and current voter registration rolls to enhance the integrity of elections.

92.     In so doing, Congress found that: (1) the right of citizens of the United States to vote is a fundamental right; (2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and (3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities. 52 US.C.A. § 20501.

93.     The NVRA exists in part to "protect the integrity of the electoral process" and "to ensure that accurate and current voter registration rolls are maintained." 52 US.C.A. § 20501.

94.     The NVRA *requires* states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" by reason of death or change of address. 52 U.S.C. § 20507(a)(4).

95.     Similarly, the U.S. Election Assistance Commission ("EAC") is required by law to report to Congress its findings related to state voter registration practices. 52 U.S.C. § 20508(a)(3).

96.     Federal regulations require states to provide data to the EAC for use in their reports, including the numbers of active voters, and the numbers of registered voters removed from the rolls for any reason. 11 C.F.R. § 9428.7(b)(1), (2), (5).

97.     The NVRA requires the States to complete any program the purpose of which is to remove ineligible voters from the official lists of eligible voters not later than ninety (90) days prior to an election.

98.     NVRA has two (2) methods of enforcement. First, the Attorney General can petition the court for declaratory and injunctive relief. Second, a private citizen can pursue a cause of action with certain requirements as follows: In a private action, notice is required, in that a person must notify the chief election official of the State involved. If the violation is not corrected within 90 days of receipt of the notice or within 20 days after receipt of the notice, if the violation occurred within 120 days before the date of an election for office, the aggrieved person may bring a civil action in an appropriate district court seeking relief. In the alternative, if the violation occurs 30 days before the date of an election for federal office, no notice is required.

99.     Although the NVRA authorizes a private cause of action, as sought here, in the form of declaratory or injunctive relief, this "remedy" is largely toothless. Any Court in the United States would have great reluctance to formally order election officials to correct the NVRA error and/or decertify an election so close in time to an actual election or just after certification.

100.     Additionally, to what extent the NVRA requires a hypothetical plaintiff to have suffered injury is not clear – standing could be a troublesome burden to prove particularly if the

harm, such as voter fraud and dilution, has been committed on a class people, the electors as a whole, rather than on an individual person.[5]

101.     Furthermore, a respondent could attempt to persuade a court to invoke the doctrine of laches to avoid the distasteful task of questioning election officials, inquiring into potentially fraudulent elections, and inaccurate voting rolls, despite a hypothetical single plaintiff being in full compliance with the private NVRA notice requirements.

102.     Congress's power to pass the NVRA comes from Article I, Section 8, Clause 18 of the United States Constitution, the Necessary and Proper Clause, making accurate voter rolls a requirement to uphold the general (as opposed to the individual) right of the people to choose their representatives.

103.     Petitioners seek to bring a private cause of action under NVRA.

**C.     HELP AMERICA VOTE ACT ("HAVA")**

104.     The Help America Vote Act ("HAVA") exists in part to "establish minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections, and other purposes." 52 US.C.A. § 21083.

105.     HAVA requires that *voter roll databases* contain only the registrations of qualified citizen voters residing in that state. 52 US.C.A. § 21083(a).

106.     HAVA defines a *voting system* as "the total combination of mechanical, electromechanical, or electronic equipment (including software, firmware, and documentation required to program, control, and support the equipment) that is used to define ballots; to cast and

---

[5] Petitioners suggests it is unlikely Congress intended to require individual standing in cases where mass violations of the NVRA occur due to widespread errors.  Petitioners aver it is much more likely Congress intended organized groups of voters to bring private actions under such circumstances under an "organizational standing" theory.

count votes; to report or display election results; and to maintain and produce any audit trail information." 52 US.C.A. § 21083.

107.    The purpose of any voting system is to accurately record, store, consolidate, and report the specific selections, and absence of selections, made by the voter as well as to accurately measure the intent of the total body of eligible voters that voted.

108.    Voter registration is encompassed in the definition of a voting system defined in HAVA because a voting system includes the documentation required to program the voting machines and to "cast and count votes." 52 US.C.A. § 21081(b).

109.    Petitioners believe and therefore aver the ability to "cast and count votes" begins with establishing eligibility and registering only qualified citizens into voter registration databases, thus assuring that all ballots granted, cast, and counted, are lawful.

110.    Petitioners believe and therefore aver that inaccurate voter rolls have significant negative consequences in elections.

111.    As *voter registration* is included by definition under the law as part of the *voting system*, it is subject to the allowable or not allowable error rates of voting systems as set forth in HAVA. 52 US.C.A. § 21081(a)(5). (The number of errors allowed using the one error per 125,000 ballots formula in the North Carolina General Election explained, *supra*., Petitioners suggest therefore it applies to voter registrations).

112.    Per HAVA, in any given state, each qualified voter is granted a unique statewide identifier in a database, which averts the risk of double-voting or extra ballots being cast in the name of one individual voter.

113.    HAVA furthermore requires that federal elections adhere to an accuracy standard, "…*set at a sufficiently stringent level such that the likelihood of voting system errors affecting the*

*outcome of an election is exceptionally remote even in the closest of elections*." United States

(2002) *U.S. Federal Election Commission FEC*. United States [Web Archive] Retrieved from the

Election Assistance Commission,

https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf

(emphasis added).

114.    Accuracy in a voting system is defined as the ability of the system to capture the

intent of voters without error. United States. (2002) *U.S. Federal Election Commission FEC*.

United States [Web Archive] Retrieved from the Election Assistance Commission,

https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf

115.    Section 301 of HAVA regarding "Voting System Standards," states that the "error

rate of [a] voting system in counting ballots . . . shall comply with the error rate standards

established under section 3.2.1 of the voting systems standards issued by the Federal Election

Commission." 52 US.C.A. § 21081(a)(5).

116.    Petitioners asks this court recall that, the FEC voting systems standards of section

3.2.1 establish that "the system shall achieve a target error rate of no more than **one in 10,000,000

ballot positions, with a maximum acceptable error rate in the test process of one in 500,000

ballot positions.**" See *supra*. at 29.

117.    The Voluntary Voting System Guidelines ("VVSG"), Version 1.1, Section 4.1.1 –

Accuracy Requirements state, in part, **"[a]ll systems shall achieve a report total error rate of

no more than one in 125,000."** Furthermore, "[t]he benchmark of one in 125,000 is derived from

the 'maximum acceptable error rate' used as the lower test benchmark in the 2005 Voluntary

Voting System Guidelines Version 1.0. That benchmark was defined as a ballot position error rate

of one in 500,000. The benchmark of one in 125,000 is expressed in terms of votes, however, it is

consistent with the previous benchmark that the estimated ratio of votes to ballot positions is ¼."

United States (2015) *U.S. Election Assistance Commission.* United States [Web Archive]

Retrieved from the Election Assistance Commission,

https://www.eac.gov/sites/default/files/eac_assets/1/28/VVSG.1.1.VOL.1.FINAL1.pdf. [6]

118.    HAVA also requires that states who receive payments for the administration of elections must use the funds "in a manner consistent with each of the laws described in Section 21145 . . . and the proposed uses are not inconsistent with the requirements of Title III." 52 U.S.C. § 20971(c).

119.    A private cause of action, as sought here, may exist for HAVA through 42 U.S.C. § 1983. *Colon-Marreror v. Velez*, 813 F.3d 1, 22 (1st Cir. 2016) (finding a private action under 1983 for HAVA violations because the provision provided enforceable voting rights and imposes binding obligations on state officials).

120.    §1983 provides a mechanism for enforcing individual rights secured elsewhere as in rights independently secured by the Constitution and laws of the United States. *Gonzaga University v. Doe*, 536 U.S. 273 (2002). Importantly, a §1983 plaintiff must assert a violation of a federal right, not just a law. *Blessing v. Freestone,* 520 U.S. 329 (1997).

121.    The private cause of action pursuant to §1983, and sought here, can be found for violations of HAVA Section 301, which requires voting systems to provide the voter with the opportunity to change the ballot or correct any apparent error before the ballot is cast and counted. 52 USC 21081(a)(1)(A)(ii). Improper configuration of the voting machines by state election officials would constitute the violation.

---

[6] In the latest version of the VVSG, or VVSG 2.0, the EAC adopted the position that "the value of 10,000,000 ballot positions is taken from VVSG 1.0 [VVSG2005], however it is used here as the minimum number of ballot positions to test without error. *If a larger number of ballot positions is used, there still can be no error.*" (emphasis added).

122.     Section 1983 is currently the only mechanism where HAVA violations will receive any meaningful private review, yet it has proven thus far to be ineffectual at providing any real remedy for such violations.

123.     Congress' power to pass the HAVA comes from Article I, Section 8, Clause 18 of the United States Constitution, the Necessary and Proper Clause, making accurate voting systems a requirement to uphold the right of the people to choose their representatives.

## NORTH CAROLINA ELECTION LAWS

124.     North Carolina statutes provide for establishment of the State Board of Elections.

125.     *Per* North Carolina General Statutes § 163-22, the State Board of Elections, among other things, is required to do the following:

a.     Investigate when necessary or advisable, the administration of election laws;

b.     Investigate frauds and irregularities in elections in any county and municipality and special district;

c.     Report violations of the election laws to the State Bureau of Investigation for further investigation and prosecution;

d.     Ensure the integrity and accuracy of all registration records in the system;

126.     The North Carolina Constitution requires voters to be born in the United States or naturalized and be 18 years-of-age. N.C. Const., Art. VI, section 1.

127.     The North Carolina Constitution also dictates that voters offering to vote in person shall present photographic identification before voting. The General Assembly shall enact general laws governing the requirements of such photographic identification, which may include exceptions. N.C. Const., Art. VI, section 2(4).

128.     North Carolina election laws describe numerous, criminal acts that constitute Class I Felonies for failing to adhere to basic election guidelines:

a.     Fraudulent Voter Registration (N.C.G.S. § 163-275(1)).

b.     Falsely swearing with respect to any matter pertaining to any primary of election (N.C.G.S. § 163-275(4)).

c.     Voting after being convicted of a crime which excludes the person from the right to suffrage without having been restored to the right of citizenship (N.C.G.S. § 163-275(5)).

d.     For any election official or other officer or person to make, certify, deliver or transmit any false returns of any primary election, or to make any erasure, alteration, or conceal or destroy any election ballot, book, record, return or process with intent to commit a fraud ((N.C.G.S. § 163-275(9)).

e.     For any person to falsely make or present any certificate or other paper to qualify any person fraudulently as a voter (N.C.G.S. § 163-275(13)).

f.     For any officer to register voters and any other individual to knowingly and willfully receive, complete, or sign an application to register from any voter contrary to the provisions of N.C.G.S. § 163-82.4 (N.C.G.S. § 163-275(14)).

g.     For any person, knowing that a person is not a citizen of the United States, to instruct or coerce that person to register to vote or to vote (N.C.G.S. § 163-275(18)).

h.     To counterfeit, sell, lend to, or knowingly permit the use of, by one not entitled thereto, a form of photo identification provided in G.S. 163-166.16 for the purposes of voting (N.C.G.S. § 163-275(19)).

129.     Petitioners believe and therefore aver that the State cannot demonstrate effective control over voter eligibility in conformity with federal or state requirements, and the State has

implemented a system that does not guarantee accuracy or compliance with legal mandates requiring the State to ensure that only eligible voters may register and vote.

**D.     ELECTION FRAUD CONGRESS SOUGHT TO GUARD AGAINST**

130.    Petitioners does not accuse any person or entity of engaging in election fraud in 2022, nor propose any person or entity will engage in such fraud in 2024, nor in subsequent federal elections in North Carolina.  Petitioners' purpose in describing types of voter fraud is to set forth the harms Congress sought to avoid by implementation of HAVA and NVRA as well as the various statutes passed by the North Carolina General Assembly and cited above.

131.    Petitioners believe and therefore aver election fraud can occur in multiple diverse ways, not all of which are individualized to a specific actor.

132.    Petitioners believe and therefore aver over the past fifty years, Congress has enacted criminal laws with broad jurisdictional basis to combat false voter registrations, vote-buying, multiple-voting, and fraudulent voting in elections in which a federal candidate is on the ballot. *See* 52 U.S.C. §§ 10307(c), 10307(e), 20511.

133.    The federal jurisdictional predicate underlying these statutes is satisfied as long as either the name of a federal candidate is on the ballot, or the fraud involves corruption of the voter registration process in a state where one registers to vote simultaneously for federal as well as other offices. *Slone*, 411 F.3d at 647–48; *United States v. McCranie*, 169 F.3d 723, 727 (11th Cir. 1999).

134.    Voting in federal elections for individuals who do not personally participate in, and assent to, the voting act attributed to them, or impersonating voters, or casting ballots in the names of voters who do not vote in federal elections, can constitute prosecutable election fraud. *See* 52 U.S.C. §§ 10307(c); 10307(e); 20511(2).

135.     It is *possible* for election officials acting "under color of law" to commit election fraud by performing acts such as diluting ballots with invalid ones (ballot stuffing), rendering false tabulations of votes, or preventing valid voter registrations or votes from being given effect in any election, federal or non-federal (18 U.S.C. §§ 241, 242), as well as in elections in which federal candidates are on the ballot. *See* 52 U.S.C. §§ 10307(c), 10307(e), 20511(2).[7]

136.     An individual commits election fraud by submitting fictitious names to election officers for inclusion on voter registration rolls, thereby qualifying the fictious name to vote in federal elections. 52 U.S.C. §§ 10307(c), 20511(2).

137.     An individual commits election fraud by knowingly procuring eligibility to vote for federal office by people who are not entitled to vote under applicable state law and/or people who are not Citizens of The United States. 52 U.S.C. §§ 10307(c), 20511(2); 18 U.S.C. §§ 1015(f).

138.     An individual who makes a false claim of United States' Citizenship to register to vote commits election fraud. 18 U.S.C. § 1015(f); 18 U.S.C. § 911.

139.     A person who provides false information concerning a person's name, address, or period of residence in a voting district to establish voting eligibility commits election fraud. 52 U.S.C. §§ 10307(c), 20511(2).

140.     Fraud can occur where an individual causes the production of voter registrations that qualify alleged voters to vote for federal candidates, where that individual knows the registrations are materially defective under applicable state law. 52 U.S.C. § 20511(2)

---

[7] For purposes of the present Petition, Petitioners do not suggest any North Carolina election officials engaged in election fraud. Rather, Petitioners points out the *possibility* of improper conduct by election officials as a harm against which Congress and the General Assembly have *sought* to guard against by enacting the various statutes cited here. A reason Congress, especially in HAVA, set forth standards that must be met before an election is considered reliable is to counter potential election fraud and to thus produce presumptively reliable election results.

141.     However, election fraud need not involve the participation of individual voters. Election fraud can occur where an individual or organization places fictious names on voter rolls (allowing for fraudulent ballots which can later be used to stuff the ballot box, *supra*.), casting fake ballots in the names of people who did not vote, obtaining and marking absentee ballots without the input of the voter involved, and falsifying vote tallies.

142.     When the federal government seeks to maintain the integrity of elections, it does so for specific federal interests *inter alia*: (1) the protection of the voting rights of racial, ethnic, or language minorities, a specific constitutional right; (2) the registration of voters to vote in federal elections; (3) the standardization and procurement of voting equipment purchased with federal funds; (4) the protection of the federal election process against corruption; (5) the protection of the voting process from corruption accomplished under color of law; and (6) the oversight of non-citizen and other voting by persons ineligible to vote under applicable state law. Richard C. Pilger, *Federal Prosecution of Election Offenses*, p. 30, 8th Edition (2017).

143.     Congress has enacted a litany of specific crimes that can be prosecuted under a general definition as "election fraud":

a.       Conspiracy Against Rights: 18 U.S.C. § 241. *See United States v. Saylor*, 322 U.S. 385 (1944) (stuffing a ballot box with forged ballots); *United States v. Classic*, 313 U.S. 299 (1941) (preventing the official count of ballots in primary elections); *United States v. Townsley*, 843 F.2d 1070, 1073–75 (8th Cir. 1988) (destroying ballots); *United States v. Morado*, 454 F.2d 167, 171 (5th Cir. 1972) (casting absentee ballots in elderly or handicapped peoples' names); *Crolich v. United States*, 196 F.2d 879, 879 (5th Cir. 1952) (impersonating qualified voters); *United*

*States v. Colvin*, 353 F.3d 569, 576 (7th Cir. 2003) (conspiracy need not be successful nor need there be an overt act).

    b.    Deprivation of Rights under Color of Law: 18 U.S.C. § 242. *See United States v. Price*, 383 U.S. 787 (1966) (acted jointly with state agents); *Williams v. United States*, 341 U.S. 97 (1951) (actions clothed under Color of State Law).

    c.    False Information in, and Payments for, Registering and Voting: 52 U.S.C. § 10307(c).[8]

    d.    Voting More than Once: 52 U.S.C. § 10307(e).

    e.    Fraudulent Registration or Voting: 52 U.S.C. § 20511(2).

    f.    False claims to Register or Vote: 18 U.S.C. § 1015(f).

    g.    "Cost-of-Election" theory: 18 U.S.C. § 1341.

    h.    Improper Retention of Federal Election Returns: 52 U.S.C. § 20701.

144.    In short, election fraud can constitute numerous different actions or inactions, and federal and state governments of the United States have an interest in guarding the integrity of elections, and ensuring election fraud is stopped, then prosecuted appropriately.

## FACTS AND SUMMARY OF THE ISSUES

145.    Petitioner United Sovereign Americans reviewed North Carolina's voter registration data from the 2022 general election including the data which contained millions of entries of voter registration information purportedly for North Carolina's voters.

146.    Thereafter, expert data analysts acting on behalf of Petitioners United Sovereign Americans performed a series of SQL database queries on the data to extrapolate and refine

---

[8] "Section 10307(c) protects two distinct aspects of a federal election: the actual results of the election, and the integrity of the process of electing federal officials." *United States v. Cole*, 41 F.3d 303, 307 (7th Cir. 1994).

information about voter registrations in the State. *See* **Exhibit** "**A**" for a copy of the SQL Database Queries.

147. Thereafter, Petitioner United Sovereign Americans thoroughly reviewed the results and expert opinions.

148. United Sovereign Americans' SQL database queries revealed hundreds of thousands of apparent voter registration errors in the State of North Carolina. *See Infra.*

149. The results from the SQL database queries allowed Petitioners' experts to produce a "Scorecard" reflecting North Carolina's voter registration data detailing the hundreds of thousands of apparent errors contained within that registration data. *See* **Exhibit** "**B**" for a copy of United Sovereign American's North Carolina 2022 General Election Validity Scorecard.

150. In addition, the results from the SQL Database Queries of North Carolina's voter registration data allowed Petitioners' experts to compile a General Election Validity Reconciliation. *See* **Exhibit** "**C**" for a copy of United Sovereign American's North Carolina 2022 General Election Validity Reconciliation.

151. According to the data provided to Petitioners United Sovereign Americans for the 2022 election, North Carolina had 7,448,689 voter registrations.

**A.     VOTER REGISTRATION ROLL INACCURACY**

152. Expert analysis by Petitioners of the official North Carolina State Voter Registration Data for the 2022 election revealed that, out of 7,448,689 voter registrations, there was a total of **1,122,761** voter registration violations including:

17,350 Illegal duplicates, where the same voter has multiple registrations.

5,452 Confirmed illegal duplicates

11,103 Voter registrations with incomplete or defective required information.

326,143 Registrations done on a state holiday or weekend.

65,895 Backdated registrations.

13,371 Altered birthdates.

1,223 Registrations for voters older than 111-years-old.

92,911 Registrations for underage voters.

159,588 Registrations with altered statewide voter registration numbers.

429,725 Registrations without a voter's social security number or driver license on file.

See **Exhibit** "**B**" for a copy of United Sovereign American's North Carolina 2022 General Election Validity Scorecard.

153.    This data shows that in 2022 the voter rolls in North Carolina were not accurate and current as required by NVRA, HAVA, nor in conformity with specific North Carolina laws pertaining to voter registration. 52 U.S.C.A. § 20501(b)(4); 52 U.S.C.A. § 21081; and N.C.G.S. 163-22.

154.    Thus far, Petitioners have exhausted every remedy known to it in advance of the 2024 general election to have these issues corrected. Petitioners continued into 2024 to seek redress and repair for these egregious violations through normal democratic means.

155.    Respondents have dismissed, and continue to dismiss, Petitioners' concerns and, based on information and belief, did so without any meaningful review, action, or response.

156.    Petitioners believe and therefore aver Respondents intend to administer and ultimately certify North Carolina's 2024 general election and subsequent federal elections (involving both state and federal contests) using the same inaccurate and flawed data and conditions.

## B. VOTES FROM INELIGIBLE VOTERS

157.    Expert analysis on behalf of Petitioners of the official North Carolina State Voter Registration Data for the 2022 election revealed that, out of the votes cast in the 2022 general election, there were a total of **579,496** evident voting violations, and **514,800** *unique* votes impacted by apparent voting violations.[9] These violations were in the form of:

3,133 Illegal Duplicates, where the same voter has multiple registrations.

1,130 Confirmed illegal duplicates.

4,414 Required information incomplete or defective.

12,638 Backdated registrations.

157 Registered after deadline.

12,584 Altered birthdates.

472 Older than 111 years old.

27,880 Underage.

1,343 Altered statewide voter registration numbers.

207,195 Registered on state holiday or weekend.

51,279 Altered votes.

47,206 Address not verified.

16 Unique voter ID with multiple votes.

209,718 Neither SSN nor driver's license on file.

331 Removed records who voted.

---

[9] Some registered voters have more than one violation. The number of unique voters indicates how many individual registrations have apparent errors – whether it be one or multiple apparent errors.

*See* **Exhibit** "**B**" for a copy of Petitioners United Sovereign American's North Carolina 2022 General Election Validity Scorecard.

158.    Petitioners believe and therefore aver this data shows that in 2022, the voter rolls in North Carolina were not accurate and current as required by the NVRA, HAVA, and specific North Carolina laws pertaining to voter registration. 52 U.S.C.A. § 20501(b)(4); 52 US.C.A. § 21081.

159.    Thus far, Petitioners have exhausted every remedy known to them in advance of the 2024 general election to have these issues, and all issues raised below, addressed and remedied. Petitioners continued in 2024 to seek redress and repair for these egregious violations through democratic means.

160.    Respondents have ignored or dismissed, and continue to ignore or dismiss, these concerns without apparent meaningful review, action, or response, and furthermore Petitioners believe and therefore aver Respondents intend to administer and certify North Carolina's 2024 (and subsequent) general election(s) (involving both state and federal contests) under the same inaccurate and flawed conditions as that have utilized in 2022 in conducting North Carolina's combined federal and state elections.

## C.    ERROR RATES IN 2022 COMPARED TO RATES PERMITTED BY FEDERAL LAW

161.    North Carolina's voting systems are subject to the permissible error rates set forth by Congress in HAVA and further elucidated by the FEC Voting System Standards 3.2.1 and explained in the VVSG. *Supra*.

162.    The *maximum* number of apparent voting system errors permissible in counting votes in the 2022 North Carolina General Election using the calculations set forth by the Federal Election Commission upon mandate by Congress was thirty-one (31) errors at most allowed. The

total number of Unique Ballots impacted by voting system errors in the North Carolina General Election, however, was 579,496 apparent errors. *See* **Exhibit** "**B**."

163.    Even accounting for the possibility that of the 579,496 apparent errors, that many were not true errors, Petitioners believe and therefore aver, the State cannot reasonably demonstrate that the 2022 General Election had thirty-one (31) or fewer errors such that the election could be considered reliable for certification.

164.    Under HAVA, an error rate of no more than one in 125,000 is permissible before the results of the *entire election* becomes suspect, and the integrity and reliability of the election compromised.   As mentioned above, this figure is calculated by dividing the total number of North Carolina votes in a given election by 125,000, to arrive at the number of permissible errors in any given election in order to create the error rate of no more than one in 125,000 mandated by the VVSG and HAVA.

165.    For the 2022 General Election this is 5,410,022 (votes cast) divided by 125,000 leaves thirty-one (31) (rounded up) as the maximum errors permitted, meaning that in order for the election to be considered valid, there cannot have been more than 31 voting system apparent errors in the entire ballot tabulation for all ballots cast in that election in North Carolina.

166.    However, in the 2022 North Carolina General Election, the number of voting system apparent errors in counting ballots for the 2022 general election was 579,469, a figure dramatically exceeding the maximum allowable apparent error rate of thirty-one (31).

167.    Because the voting system apparent error rate for the 2022 North Carolina General Election was far above the maximum allowable error rates, Petitioners believe and therefore aver the reliability and credibility of the 2022 results are cast into doubt as a matter of law.

**VOTER-TO-VOTE DEFICIT**

168.  The official canvas for the 2022 North Carolina Election was 3,790,202 ballots counted yet the data shows there exist 3,789,810 total votes cast – a discrepancy of 392 votes. *See* **Exhibit** "**B**."

169.  This discrepancy can best be defined as a Voter-to-Vote deficit.

170.  Additionally, the official canvas for the 2022 North Carolina Election was 3,790,202 votes (ballots counted) yet there exist only 3,789,810 *voters who actually voted* according to the data provided – a discrepancy of 392 votes that North Carolina election officials cannot explain or account for—a number far in excess of thirty-one (31) and indisputably each constitutes an "error."

171.  Petitioners believe and therefore aver that the **392 more votes counted than voters who voted** means that either tabulators overcounted votes statewide, or there is an alternative source of the data discrepancy.[10]

**D.  NORTH CAROLINA'S 2022 GENERAL ELECTION VALIDITY**

172.  For North Carolina's 2022 General Election, out of the 7,448,689 total registrations, of which Petitioners believe and therefore aver, there were 6,564,654 *eligible* registrations, the difference being 768,393 uncertain/illogical/invalid registrations and 115,642 registrations, which violated election laws. *See* **Exhibit** "**C**."

173.  Petitioners believe and therefore aver that of the people holding the 6,564,654 eligible registrations, 3,790,202 votes were counted in the 2022 General Election.

---

[10] Petitioners accuse no one of engaging in fraud or deceit. Petitioner merely point out the discrepancy, which could be due to unintentional tabulator error, some fraud of unknown origin, a combination of both, or even fraud by the tabulators themselves. The discrepancy occurred in 2022 for an unknown reason. It is the deficit *itself*, regardless of the cause, which demonstrates an error rate in excess of that permitted by HAVA calling into question the integrity of the election. Petitioners propose to ask this Court to order Respondents to ascertain why the deficit occurred in 2022, ensure that a similar deficit does not re-occur in 2024, and in all federal elections thereafter in the future.

174.    Petitioners believe and therefore aver that of the identified 768,393 uncertain/illogical/invalid registrations, **432,376 people voted** and had their votes counted in the 2022 General Election, each of which North Carolina election officials should have confirmed eligibility to vote before counting that vote and Petitioners aver did not.

175.    Petitioners believe and therefore aver that of the total of 115,642 registrations that violated election laws in one way or another, **81,632** people holding such registrations *cast votes that were counted* in the 2022 General Election, each of which North Carolina election officials should have confirmed eligibility to vote before counting that vote and Petitioners aver did not.

176.    Petitioners believe and therefore aver that the *registration* error rate in North Carolina for the 2022 General Election was **twelve percent (12%)** of the total registrations on the State's voter rolls.  This figure is arrived at by taking 768,393 uncertain/illogical/invalid registrations, plus 115,642 registrations which violated election laws, as a percentage of 7,448,689 total registrations.

177.    Petitioners believe and therefore aver that the *voter* system error rate in North Carolina for the 2022 General Election was **fourteen (14%)**, arrived at by taking 432,376 votes counted from uncertain/illogical/invalid registrations, plus 81,632 votes counted from illegal registrations, as a percentage of 3,789,810 votes cast.

178.    Per HAVA and the FEC, the legal standard of allowable registration errors for a federal election is 0.0008% (or 1 out of 125,000) yet the voter system error rate in North Carolina's 2022 combined state and Federal General Election was 14%.

# REQUESTED RELIEF

## ALL WRITS ACT RELIEF – 28 U.S.C. § 1651

179.    Petitioners incorporate the previous paragraphs by reference as if set forth at length here.

180.    Petitioners are not seeking to undermine official elections results previously certified.  Petitioners has cited issues in prior North Carolina federal elections to add weight to Petitioners' belief that absent intervention by this Honorable Court, Respondents will permit the same apparent errors to occur in the 2024 (and subsequent) General Election(s) in North Carolina, and in all following federal elections in the State.

181.    Petitioners seek redress from the constitutional harm brought upon them, and the North Carolina electorate at large, by Respondents' failure to comply with federal and state election law.

182.    Petitioners believe and therefore aver that Respondents have done nothing, or an inadequate job, addressing the issues presented in this Petition – particularly to address the inaccurate and likely fraudulent voter rolls and voter systems used in federal elections conducted by state authorities.

183.    Respondents' inaction and/or failure to act compels Petitioners to ask the Court to issue a Writ of *Mandamus* requiring Respondents to comply with the two federal statutes at issue (the NVRA and the HAVA) along with equitable relief under N.C. Gen. Stat. § 163-278.28, while giving Respondents a reasonable time within which to bring North Carolina into compliance in time for the 2024 General Election and all federal elections conducted by the State going forward, while providing relief to 2024 voters if, upon showing by Respondents, bringing the State into compliance in time is impossible.

184. Specifically, Petitioners respectfully seek the Court order Respondents take steps, both short term and long term, to ensure the apparent errors made during the 2022 elections do not recur, and to bring the State into compliance with HAVA's specific mandate of no greater than 1 voting error out of 125,000 votes in the 2024 and subsequent federal general elections in North Carolina.

185. This Honorable Court is authorized to issue a writ of *mandamus* under "The All-Writs Act," 28 U.S.C. § 1651 granting the power to United States Federal Courts to "issue all writs necessary or appropriate in the aid of their respective jurisdictions and agreeable to the usages and principles of law."

186. A writ of *mandamus* under 28 USC § 1651 is typically used to fill gaps in the law, and the Supreme Court has stated that The All-Writs Act is a "legislatively approved source of procedural instruments designed to achieve 'the rational ends of the law.'" *Harris v. Nelson*, 394 U.S. 286 (1969) (All Writs Act *mandamus* properly used to conduct factual inquiries).

187. A writ of *mandamus* is warranted where "(1) no other adequate means exist to attain the relief, (2) the party's right to issuance of the writ is clear and indisputable, and (3) the writ is appropriate under the circumstances." *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (*quoting Cheney v. United States Dist. Ct.*, 542 U.S. 367, 380–81 (2004) (stay granted where district court likely did not follow federal law)).

188. A writ of *mandamus* is appropriate and necessary to vindicate the rights of citizens when a governmental agency or official has refused to perform a ministerial duty that the Petitioners has established has a clear legal right to have the governmental agency or officials, in this case Respondents, perform.

189.    A federal court may use all auxiliary writs as aids when it is "calculated in [the court's] sound judgment to achieve the ends of justice entrusted to it." *Adams v. United States*, 317 U.S. 269, 273 (1942) (writ of *habeas corpus* is available to the circuit courts of appeals).

190.    A "ministerial action" is a duty in a particular situation so plainly prescribed as to be free from doubt and equivalent to a positive command. *Wilbur v. United States*, 281 U.S. 206, 218 (1930); *see also Will v. United States*, 389 U.S. 90 (1967).

191.    "Mandamus is employed to compel the performance, when refused, of a ministerial duty . . . [i]t also is employed to compel action, when refused, in matters involving judgment and discretion, but not to direct the exercise of judgment or discretion in a particular way nor to direct the retraction or reversal of action already taken in the exercise of either." *Wilbur v. United States*, 281 U.S. 206, 218 (1930). *See also Decatur v. Paulding*, 39 U.S. 497, 514-17 (1840) (Secretary of the Navy's duty to approve of pensions was discretionary, and therefore, not ministerial); *Kendall v. United States*, 37 U.S. 524 (1838) (Postmaster General had a ministerial duty to make entries); *Work v. Rives*, 267 U.S. 175, 177 (1925).

192.    Instantly, Petitioners have no other remedy apart from a writ of *mandamus*.

193.    Petitioners argue that injunctive and/or declaratory relief is inapplicable or appropriate in this matter because the harm from the 2024 election is not yet realized and Petitioners are seeking to have North Carolina election officials and/or federal officials bring the State into compliance with federal and state law, specifically HAVA, NVRA, and Chapter 163 of the North Carolina General Statutes, absent a specific existing private cause of action Petitioners could assert that affords Petitioners relief.

194.    Petitioners believe and therefore aver and assert private causes of action to enforce federal and state law where Respondents have allowed, and continue to allow, violations

of federal election laws, State election laws, the United States Constitution, and federal civil rights laws pertaining to voter rights, which include mandating accurate registration rolls, transparency, compliance, and proper certification of the voting systems. 52 US.C.A. § 20501; 52 US.C.A. § 21083.

195.    Petitioners believe and therefore aver that the voter rolls within the State of North Carolina are inaccurate, in violation of NVRA and HAVA. These are not list maintenance failures. The inaccuracies represent a failure to control the process of validating and registering only qualified citizen voters. Persons possessing apparently invalid and/or illegal registrations voted in large numbers in North Carolina's 2022 General Election.

196.    Petitioners believe and therefore aver the Respondents have lost control of voter registration, leading to the distribution of ballots to what appear to be false registrants which results in a diluted vote to all voters including Petitioners, harming the electorate at large. The voter-to-vote deficit is illustrative here in that the official canvas for the 2022 North Carolina Election was 3,790,202 votes counted when there exist 3,789,810 total ballots cast in the data – a discrepancy of 392 votes. Upholding HAVA includes the risk assessments and proper certification of all system elements individually, and the system as a whole.

197.    Petitioners believe and therefore aver an election official's job is fidelity to the law in administering the electoral process, thereby protecting the integrity of an election, and the citizens from corruption in the election process.

198.    Petitioners believe and therefore aver that State officials' failure to follow the law has resulted in election outcomes that are untrustworthy. The voting system in its present form cannot be used to produce trustworthy and reliable results without the requested judicial intervention.

199.    Petitioners believe and therefore aver that a writ of *mandamus* is appropriate in this case. Respondents have failed, and continue to fail, in complying with federal and state laws regarding voting – including voting accuracy and accountability. It is clear from the Respondents conduct before, during, and after, the 2022 elections that, absent judicial action, despite notice, Respondents will do nothing to repair the deficiencies noted above to ensure the integrity of North Carolina elections are conducted in compliance with federal and state law.

200.    The scope of Petitioners' *mandamus* request is narrow: Petitioners seek this Court to order Respondents to follow existing federal and state law designed by Congress and the North Carolina legislature to ensure that North Carolina's 2024 and subsequent combined federal and state general elections produce reliable results within the margin of error rate allowed.

201.    Petitioners hold up the mathematically unreliable analysis (according to, *inter alia*, HAVA) of the 2022 North Carolina combined federal and state General Election as evidence that, should the writ not issue, the apparent error rate in the 2024 and subsequent combined general elections will continue to exceed the law's mandated maximum error rate permitted and continue to produce election results that are unreliable that should not be certified.

202.    Petitioners seek that the requested writ direct Respondents to investigate and remedy the issues exposed in the 2022 elections to avoid repeating the same mistakes in future combined federal and state general elections which are constitutionally administered by North Carolina pursuant to Article I, Section 4 (delegating to the state legislatures the power to regulate federal elections for members of the House of Representatives, with Congress reserving the power to "…alter such Regulations [made by the various state legislatures]…"),[11] and, generally,

---

[11] Petitioners aver that NVRA and HAVA are examples of Congress' exercising its power under Article I, Section 4 to "alter" North Carolina's (and all other state's) otherwise absolute constitutional authority to regulate federal elections to the House of Representatives and, by application of the 17th Amendment to the U.S. Constitution providing for the direct election of two senators from each state, Congress may exercise its authority "…from time

Article II, Section 1 (granting state legislatures the power to determine how presidential electors are chosen) of the United States Constitution.[12]

203.     Petitioners believe and therefore aver that since the Constitution reserves to Congress the *ultimate* (as opposed to the *presumptive*) power to regulate the means by which Congress' own members are chosen, while the Constitution simultaneously delegates the presumptive power to regulate such elections to, in this case, the legislature of the State of North Carolina to further delegate as it sees fit to do so by law, the Respondents here, who are not federal officers *per se*, *become* federal officers by agency requiring them to carry out not only North Carolina election law, but additionally to carry out federal election statutes passed by Congress and duly signed into law by the President under Congress' ultimate authority laid out in Article I, Section 4 of the Constitution.

204.     Petitioners believe and therefore aver that delegations of authority by the General Assembly of powers to supervise federal elections to any Respondent State officials pursuant to the General Assembly's power to regulate federal elections granted by Article I, Section 4, makes said State Respondents into federal officers by agency or quasi-federal officials in the conducting of their duties to regulate federal elections.

205.     Petitioners believe and therefore aver that ordinary principles of federalism and dual sovereignty where a federal district court judge would be reluctant to issue an order to a State official pertaining to how that state official may perform his/her official functions are inapplicable

---

to time by Law make or alter such Regulations…" [of the various states…] to regulate the election of United States Senators as well the election of members of the House of Representatives.

[12] Petitioners include citation to Article II and the choosing of electors for president and vice-president, (later modified by the 12th Amendment), to again demonstrate the Framers' intent that the various states shall have presumptive authority to regulate and administer the election of all federal officers on the ballot for consideration in a federal election. Article 1, Section 4 (as later amended) and Article II, Section 1 (as later amended) are examples of where the Framers intentionally intertwined the powers of the various states with those of Congress, while making certain Congress maintained the *ultimate* power to regulate the election of its members, the then-prevailing concepts of *Federalism* and *Dual Sovereignty* notwithstanding.

because the Respondent State official is acting in his/her hybrid role as a quasi-federal officer as required by Article I, Section 4.

206.     Petitioners believe and therefore aver, then, that this Honorable Court has authority to issue the requested writ of *mandamus* to compel, not just the Respondent Federal officers to ensure that federal election law is carried out in North Carolina's 2024 and subsequent general elections, this Court also has the authority to compel Respondent State officials because said officials are charged by the U.S. Constitution in the carrying out of federal law where Congress has asserted its power to "alter" existing North Carolina federal election procedures as it did in enacting NVRA and HAVA.

207.     Petitioners believe and therefore aver that any delegation from the North Carolina legislature to the Executive Branch of North Carolina government (e.g., to the Governor who in turn delegates power to the Secretary of State, or any delegation of the General Assembly's power to regulate federal elections to the Attorney General) still falls under this Court's authority which is derived through Article I, Section 4's grant to the various state legislatures of the power to supervise federal elections.

208.     Petitioners believe and therefore aver that simply because the state legislature may have chosen to delegate some of its authority to supervise federal elections to Respondent members of the State's Executive Branch of government, such delegation does not insulate such officials from the power of this Court, since this Court's power comes from its authority over the delegating entity, in this case the North Carolina legislature.

## ACTION TO COMPEL AN OFFICER OF THE UNITED STATES TO PERFORM HIS DUTY – 28 U.S.C. § 1361

209.     Petitioners incorporate the previous paragraphs as if set forth at length here.

210.    District Courts are empowered with the ability to compel an officer or employee of the United States or any agency thereof to perform a duty owed to a plaintiff. 28 U.S.C. § 1361.

211.    Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice are parties responsible for the enforcement of federal election laws, specifically HAVA and NVRA.

212.    Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice are officers, employees, or an agency of the United States.

213.    Petitioners believe and therefore aver that Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice, have done nothing, or, at best, an inadequate job at addressing the issues presented above – namely, the inaccurate and likely fraudulent voter rolls and systems within North Carolina.

214.    The inaction and/or failure to act is harming Petitioners and the North Carolina electorate at large warranting that the Court issue a Writ of *Mandamus* compelling Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice to enforce and police the two federal statutes at issue (NVRA and HAVA) for implementation in the North Carolina 2024 General Election and subsequent combined federal and state elections administered by State officials and giving Respondents a reasonable period of time in which to do so.

215.    Specifically, the Court should order Respondents to take preventative measures to see the apparent errors evident the 2022 elections are not repeated in the 2024 and subsequent elections and bring the State into compliance with HAVA's specific mandate of no greater than 1 voting error out of 125,000 votes to ensure reliable election results as HAVA intended.

216.     A writ of *mandamus* is warranted where "(1) no other adequate means exist to attain the relief, (2) the party's right to issuance of the writ is clear and indisputable, and (3) the writ is appropriate under the circumstances." *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (quoting *Cheney v. United States* Dist. Ct., 542 U.S. 367, 380–81 (2004) (stay granted where district court likely did not follow federal law).

217.     A writ of *mandamus* is appropriate and necessary to vindicate the rights of citizens when a governmental agency or official has refused to perform a ministerial duty that the Petitioners has established has a clear legal right to have the governmental agency or official, in this case Respondents, perform.

218.     A "ministerial action" is a duty in a particular situation so plainly prescribed as to be free from doubt and equivalent to a positive command. *Wilbur v. United States*, 281 U.S. 206, 218 (1930); *see also Will v. United States*, 389 U.S. 90 (1967).

219.     Relief contemplated under statute providing that federal district courts shall have original jurisdiction of any action in nature of mandamus to compel an officer or employee of United States or any agency thereof to perform a duty owed to plaintiff is at least as broad as under common-law writ of *mandamus*. *Carey v. Local Bd. No. 2, Hartford, Conn.*, 297 F.Supp. 252 (D. Conn. 1969), aff'd, 412 F.2d 71 (2d Cir. 1969).

220.     Petitioners believe and therefore aver they have no other remedy than a writ of *mandamus* to compel an officer or employee of the United States or any agency thereof to perform a duty owed to plaintiff/Petitioners.

221.     Petitioners argue that injunctive and/or declaratory relief is inapplicable or inappropriate to its issues because the harm from the 2024 election is not yet realized and Petitioners is seeking to have North Carolina election officials and/or federal officials bring the

State into compliance with federal and state law using private causes of action, specifically under HAVA, NVRA, and the Election Code, absent other specific private causes of action that afford Petitioners relief.

222. Petitioners believe and therefore aver Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice have allowed, and will continue to allow, violations of federal election laws, the United States Constitution, and federal civil rights laws pertaining to voter rights, which include mandating accurate registration rolls, transparency, compliance, and proper certification of the voting systems.

223. Petitioners believe and therefore aver the voter rolls within the State of North Carolina are inaccurate, in violation of NVRA and HAVA. That these are not list maintenance failures. Instead, the inaccuracies represent a failure to control the process of validating and registering only qualified citizen voters. Persons voted in the North Carolina 2022 General Election in significant numbers who held apparently invalid and/or illegal registrations that North Carolina election officials, on information and belief, did nothing to verify.

224. Petitioners believe and therefore aver that Respondents' failure to follow the law, or enforce the law, has resulted in election outcomes that are untrustworthy and unreliable. The State's voting system in its present form cannot be trusted to produce reliable results under HAVA, because Respondents will not follow the dictates of the Act necessitating this judicial intervention.

225. A writ of *mandamus* against Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice is appropriate in this case. Respondents Merrick Garland, in his Official Capacity as Attorney

General of the United States, and the United States Department of Justice have failed, and continue to fail, in requiring the State of North Carolina to comply with federal laws regarding voting – including voting accuracy and accountability as is clear from how the 2022 North Carolina General Election was conducted.

226.    Petitioners believe and therefore aver that without judicial action, Respondents will do nothing to comply with HAVA and other federal and state statutes to ensure the integrity of North Carolina's elections and the same issues that are evident from the 2022 General Election will call into question the validity of North Carolina's 2024 and subsequent General Election results.

227.    The scope of this request for a writ of *mandamus* is narrow: Petitioners seek a judicial order requiring Respondents, both federal and state, to follow the laws cited herein in conducting the 2024 and subsequent federal elections, and adequately investigate and remedy the problems exposed in and 2022 elections and detailed above.

## CONCLUSION

**WHEREFORE**,  Petitioners respectfully request Your Honorable Court formally recognize North Carolina's voter registration rolls contained hundreds of thousands of apparent errors in the 2022 General Election. Further, that these apparent errors took the form of illegal duplicate registrations, incomplete or unknown addresses, registrations on or before the registrant's date of birth, age discrepant registrants, registrations on a federal holiday, registrations on Sunday, registrations with modified dates of birth, registrants whose voter history inexplicably changed, registrants with registration dates altered backwards, and registrants with altered "unique" state voter identification numbers. Petitioner asks this Court to enter an order in *mandamus* compelling Respondents to ministerially correct the apparent errors evident from the 2022 elections data, ascertain to the Court's satisfaction the reasons why the

2022 errors occurred, and prevent those same or similar ministerial errors from recurring during the North Carolina 2024 General Election and all subsequent federal general elections to ensure the integrity of North Carolina's combined federal and state elections going forward for years to come. Petitioners, additionally, seek pursuant to permissible causes of action under NVRA and HAVA, this Court order that the State of North Carolina may not certify the 2024 General Election unless and until the relevant Respondents have demonstrated to the Court that the 2024 General Election and subsequent elections were conducted in conformity with federal and state law and with fewer than the maximum errors permissible. Petitioners further request this Honorable Court order the state, and any subdivision thereof responsible for voter registrations, submit voter registration requests (and any existing registrations reasonably in question) to the Department of Homeland Security to verify the citizenship or immigration status of persons seeking registration to vote or who are presently on the state's voter rolls whenever there exist any reliable indicators that an applicant or registered voter may not be a U.S. citizen. (*see*: 8 U.S.C. secs.1644 & 1373(c)). Lastly, Petitioners seek and order in *mandamus* requiring all public officials named as Respondents perform their duties as the law intended whether it be conducting federal elections in conformity with the law or investigating, and where warranted in their discretion, prosecuting persons or entities for failing to perform their duties in conformity to the law after being given timely notice to do so.

Respectfully Submitted,

**Van der Veen, Hartshorn, Levin, & Lindheim**

Date: August 28, 2024

By: */s/ Bruce L. Castor, Jr.*
Bruce L. Castor, Jr.
PA I.D. No. 46370
*Pro Hac Vice*
1219 Spruce Street
Philadelphia, PA 19107

Main: (215) 546-1000
Fax: (215) 546-8529
Email: bcastor@mtvlaw.com
*Attorney for the Petitioners*

Date: August 28, 2024

By: /s/ Matthew P. Ceradini
Matthew P. Ceradini
NC Bar No: 45921
Ceradini Law, PLLC
8480 Honeycutt Rd., Ste. 200, Raleigh, NC 27615
Phone: 919-931-0702 / Fax: 919-825-1805
m.ceradini@ceradinilaw.com
*Local Civil Rule 83.1(d) Attorney*

EXHIBIT A




# North Carolina



# Voting System Comprehensive Formal Report



North Carolina Chapter

# Contents

Page(s)

1. Cover letter     3

2. North Carolina Election Validity Scorecard     4

3. Detailed summary with references to data output files     5-8

4. Election laws considered to support data analysis     9-10

5. CD disk containing all output files from analysis     N/A



**North Carolina State Board of Elections**                                                          April 29, 2024
PO Box 27255
Raleigh NC 27611-7255
Re: North Carolina Voting System Comprehensive Formal Report


To: Karen Brinson Bell - Executive Director and Members of the State Board of Elections,

I am a volunteer working with team of data analysts, software engineers and concerned citizens. We are submitting this complaint to the North Carolina State Board of Elections on behalf of the North Carolina Chapter of United Sovereign Americans.

The North Carolina voter data (published by the North Carolina State Board of Elections at https://dl.ncsbe.gov/) appears to contain over a million errors in voter registrations. These errors require explanation or should be classified as illegal registrations and are not compliant with Federal and State voting procedure requirements. Analysis of only the 2022 Federal General Election results in North Carolina revealed almost 600,000 votes were cast by these potentially illegal registrants, resulting in an election that could not be legally certified according to "black letter law".

We stress that this is not a vague complaint of election fraud conspiracy. It is not an attempt to overturn any particular election result. This is intended, however, to point out what may be ongoing illegal procedures and a failure to follow the law in elections in North Carolina. Any such illegalities must be identified and remedied.

If you choose to dismiss the facts forming the basis of this inquiry, further action will be pursued. We would hope, however, that the factual anomalies are investigated and satisfactorily explained and, where needed, processes corrected to prevent similar errors in the future. While we do not know who is responsible for these anomalies, we do know who certified election results contrary to standards for error, accuracy and compliance. We hope that the facts are recognized, investigated, explained and addressed.

Our concern is that the resulting election certifications were made despite objective data, raising concerns that the State had massively compromised systems and processes. The resultant certifications may represent serious disregard of the voters' civil and constitutional rights within the state.

We have attached our summary report, our detailed method of analysis, and result files containing anomalies found. This analysis used data provided from the North Carolina State Board of Elections as published on website https://dl.ncsbe.gov/ which is represented by the NCSBOE as an accurate representation of the public records portions of their "COMPUTERIZED STATEWIDE VOTER REGISTRATION LIST" (HAVA designation).

We respectfully request a response of intentions from the NCSBOE within ten (10) days including a plan to correct all errors. Your immediate attention toward resolving these issues is critical for certifying the upcoming election on May 14th, 2024.

Sincerely,

_____
Rick Yost - USA - North Carolina Chapter
3652 Jordan Cir., Franklinton, NC 27525
(919) 381-8770 Rick.Yost@USA4Freedom.org

Attachments/Enclosure:
1.  North Carolina's 2022 General Election Validity Scorecard
2.  Detailed summary of our method of analysis
3.  CD of data output files from analysis




North Carolina Chapter

# North Carolina's 2022 General Election Validity Scorecard

### ★ 1. Were the voter rolls accurate, as required by the National Voter Registration Act of 1993? *

| Ineligible or Uncertain Registration Type | Number of Instances |
|---|---|
| Illegal Duplicates | 17,350 |
| Confirmed Illegal Duplicates | 5,452 |
| Required Information Incomplete or Defective | 11,103 |
| Registered on State Holidays or Weekends | 326,143 |
| Backdated Registrations | 65,895 |
| Altered Birthdates ** | 13,371 |
| Older Than 111 | 1,223 |
| Underage | 92,911 |
| Altered Statewide Voter Registration Numbers *** | 159,588 |
| Neither SSN nor Driver's License on File | 429,725 |
| **APPARENT REGISTRATION VIOLATIONS:** | **1,122,761** |

### ★ 2. Were the votes counted from eligible voters, as required by the US Constitution? ****

| Seemingly Invalid or Illegal Registration Type that Voted in 2022GE | Votes cast in 2022 GE |
|---|---|
| Illegal Duplicates | 3,133 |
| Confirmed Illegal Duplicates | 1,130 |
| Required Information Incomplete or Defective | 4,414 |
| Backdated Registrations | 12,638 |
| Registered After Deadline | 157 |
| Altered Birth dates | 12,584 |
| Older Than 111 | 472 |
| Underage | 27,880 |
| Altered Statewide Voter Registration Numbers | 1,343 |
| Registered on State Holidays or Weekends | 207,195 |
| Altered Votes | 51,279 |
| Address Not Verified | 47,206 |
| Unique Voter ID With Multiple Votes | 16 |
| Neither SSN nor Driver's License on File | 209,718 |
| Removed records who voted | 331 |
| **APPARENT VOTING VIOLATIONS:** | **579,496** |

### ★ 3. Was the number of votes counted equal to the number of voters who voted?

| Official Source | Reported Total |
|---|---|
| State Official Results of 2022 GE report | Ballots counted: 3,790,202 |
| State raw data, official federal document | Voters who actually voted: 3,789,810 |
| **DIFFERENCE:** | **392 more votes counted than voters who voted** |

### ★ 4. Was the number of ballots in error valid according to the Help America Vote Act of 2002?

| | |
|---|---|
| Apparent voting violations in the 2022 GE according to State BOE raw data | **579,496** |
| Allowable ballot error rate is one per 125,000 ballots cast (3,790,202 / 125,000 = 30.3) | **30** |
| **DIFFERENCE:** | **579,466 errors in excess of legal standard** |

*"Congress seeks. . . .to guard the election of members of Congress against any possible unfairness by compelling, under its pains and penalties, everyone concerned in holding the election to a strict and scrupulous observance of every duty devolved upon him while so engaged. . . . The evil intent consists in disobedience to the law." —In re Coy, 127 U.S. 731 (1888)*

* Data extracted from a copy of the North Carolina statewide voter registration database downloaded from the North Carolina State BOE website, as posted on 12/03/2022.
** Data extracted from North Carolina statewide voter registration database files downloaded from the North Carolina State BOE website, posted between 05/13/2017 and 12/23/2023
*** Data extracted from a copy of 49 North Carolina snapshot database files downloaded from the North Carolina State BOE website, posted between 1/1/2009 and 1/1/2024
**** Data records revealed in section one of the scorecard, then compared to historical data extracted from North Carolina statewide voter history database from the North Carolina State BOE website 12/03/2022.

© United Sovereign Americans, Inc.

Unite4Freedom.com ★ info@Unite4Freedom.com

04242024



**Summary of apparent registration and voting violations with data output files**

1. Were the voter rolls accurate, as required by the National Voter Registration Act of 1993?

   **Seemingly Ineligible or Uncertain Registration Type**

   **1.1. Illegal Duplicate Registrations - 17,350 records**
   Federal law requires that electors have one unique state identifier, hence, in any single voter roll file, only one registration record per voter. Analysis of the NC state voter rolls found over 50,000 records were revealed that appear to have been given multiple state voter ID's. Since many of the same records were found in several categories of error, the number of duplicate records revealed a total of 17,350 duplicate records.
   >> See data output file named USA-NC-1-01.csv

   **1.2. Confirmed Illegal Duplicate Registrations - 5,452 records**
   In response to public records requests #22-215 and #23-146, two lists of NC voter ID's were provided by the state BOE. Despite these state files revealing 5,452 voter ID's designated as duplicate records by the state, they remained on the 12/03/2022 voter rolls following the 11/29/2022 election certification.
   >> See data output file named USA-NC-1-02.csv

   **1.3. Required Information Incomplete or Defective - 11,103 records**
   A total of 11,103 records were found with the following anomalies:
   - First or last name missing or a single initial
   - Residential address registered in multiple counties
   - Precincts missing from registration
   - Confidential email addresses exposed
   - Invalid characters in legal name
   - Residential addresses without house numbers
   - First name same as last name
   - First name same as middle name
   >> See 7 data output files named USA-NC-1-03-xx.csv

   **1.4. Registered on State Holidays or Weekends - 326,143 records**
   326,143 registrations have a registration date on a weekend or holiday.
   >> See 2 data output files named USA-NC-1-04-xx.csv

   **1.5. Backdated Registrations - 65,895 records**
   Analysis of 16 voter registration files between 08/29/2022 and 12/03/2022 revealed 65,895 records added to or updated in the voter rolls during the election season with backdated registration dates.
   - When a new NCID was added to the voter rolls, the date the registration application was processed should have been during the previous week but instead was dated prior to the previous week (giving a 2 days grace period).
   - When a voter record was moved from Removed or Denied status to Active, Inactive or Temporary status on the voter rolls, the date the new registration application was processed should have been during the previous week but instead was dated prior to the previous week (giving a 2 days grace period).
   >> See data output file named USA-NC-1-05-01.csv

Case 4:24-cv-00128-M-RJ   Document 1   Filed 08/28/24   Page 56 of 70

 
**1.6. Altered Birthdates - 13,371 records**
Analysis of data extracted from multiple North Carolina statewide voter registration database files downloaded from the North Carolina State BOE website posted between 05/13/2017 and 12/23/2023 revealed 13,371 voter records with birth years which changed from one voter roll file to the next file.
>> See data output file named USA-NC-1-06-03.csv

**1.7. Older Than 111 Years of Age - 1,223 records**
According to the voter roll as of 12/03/2022, 1,223 records have a birth year that indicates the voter was born prior to 1912. The oldest known person alive in NC was born in 1912 according to all public data found during the 2022 election.
https://longeviquest.com/2023/10/catherine-ferrell-north-carolinas-oldest-living-person-turns-111-years-old/
>> See data output file named USA-NC-1-07.csv

**1.8. Underage - 92,911 records**
92,911 voter records have a birth year that indicate the voter was added to the official registration list before the voter could have turned 18 years old prior to the date of a federal general election.
>> See data output file named USA-NC-1-08.csv

**1.9. Altered Statewide Voter Registration Numbers - 159,588 records**
Analysis of data extracted from the North Carolina snapshot database files for snapshot file dates between 01/01/2009 and 01/01/2024 revealed 159,588 records that had voter registration numbers altered.
>> See data output file named USA-NC-1-09.csv

**1.10.      Voters with Neither SSN nor DL Number on File - 429,725 records**
Public Records Request #23-21 revealed 429,725 voter records with neither SSN nor DL on file.
>> See data output file named USA-NC-1-10.csv

| APPARENT REGISTRATION VIOLATIONS: | 1,122,761 |
|---|---|

 
## 2. Were the votes counted from eligible voters, as required by the US Constitution?

**Seemingly Invalid or Illegal Registration Type that Voted in 2022GE**
Analysis performed using the 12/03/2022 voter history file, which was the first history file post-certification on 11/29/2022.

### 2.1. Illegal Duplicate Registrations - 3,133 ballots
Using the results from section 1.1, examined the 12/03/2022 voter history to determine if a ballot was cast in the 2022 General Election.
>> See data output file named USA-NC-2-01-04.csv

### 2.2. Confirmed Illegal Duplicates - 1,130 ballots
Using the results from section 1.2, examined the 12/03/2022 voter history to determine if a ballot was cast in the 2022 General Election.
>> See data output file named USA-NC-2-02-01.csv

### 2.3. Invalid Registrations (required information is incomplete or defective) - 4,414 ballots
Using the results from section 1.3, examined the 12/03/2022 voter history to determine if a ballot was cast in the 2022 General Election.
>> See 7 data output files named USA-NC-2-03-xx.csv

### 2.4. Backdated Registrations - 12,638 ballots
Using the results from section 1.5, examined the 12/03/2022 voter history to determine if a ballot was cast in the 2022 General Election.
>> See data output file named USA-NC-2-04-01.csv

### 2.5. Registered After Deadline - 157 ballots
Officially registered after deadline, but voted. Registration deadlines as follows:
- Absentee One-Stop, Absentee Curbside, Transfer: 11/07/2022
- Absentee by Mail, In-Person, Curbside: 10/17/2022
- Provisional: 11/18/2022
- Voters in S status (UOCAVA): 11/08/2022
>> See data output file named USA-NC-2-05-03.csv

### 2.6. Altered Birthdates - 12,584 ballots
Using the results from section 1.6, examined the 12/03/2022 voter history to determine if a ballot was cast in the 2022 General Election.
>> See data output file named USA-NC-2-06.csv

### 2.7. Older Than 111 Years of Age - 472 ballots
Using the results from section 1.7, examined the 12/03/2022 voter history to determine if a ballot was cast in the 2022 General Election.
>> See data output file named USA-NC-2-07.csv

### 2.8. Underage - 27,880 ballots
Using the results from section 1.8, examined the 12/03/2022 voter history to determine if a ballot was cast in the 2022 General Election.
>> See data output file named USA-NC-2-08.csv

 
## 2.9. Altered Statewide Voter Registration Numbers - 1,343 ballots
Using the results from section 1.9, examined the 12/03/2022 voter history to determine if a ballot was cast in the 2022 General Election.
>> See data output file named USA-NC-2-09.csv

## 2.10. Registered on State Holidays or Weekends - 207,195 ballots
Using the results from section 1.4, examined the 12/03/2022 voter history to determine if a ballot was cast in the 2022 General Election.
>> See 2 data output files named USA-NC-2-10-xx.csv

## 2.11. Altered Votes - 51,279 ballots
Records in the 12/03/2022 voter history file at certification were later altered.
>> See 3 data output files named USA-NC-2-11-xx.csv

## 2.12. Address Not Verified - 47,206 ballots
New or changed voters not verified as of 12/03/2022 but voted.
>> See data output file named USA-NC-2-12.csv

## 2.13. Unique Voter ID With Multiple Votes - 16 ballots
NCIDs showing more than one voter history record for the 11/08/2022 General Election.
>> See data output file named USA-NC-2-13.csv

## 2.14. Voters With Neither SSN nor DL Number on File - 209,718 ballots
Using the results from section 1.10, examined the 12/03/2022 voter history to determine if a ballot was cast in the 2022 General Election.
>> See data output file named USA-NC-2-14.csv

## 2.15. Removed Voters - 331 ballots
Voters in Removed status yet they show votes cast. Registration records with a removed status should not have had a vote cast.
>> See data output file named USA-NC-2-15.csv

<span style="background-color:#8B2332;color:white">**APPARENT VOTING VIOLATIONS:**</span> <span style="background-color:#8B2332;color:white">**579,496**</span>

**3. Was the number of votes counted equal to the number of voters who voted?**
**3.1. Total State Official Results of 2022 GE report 3,790,202 votes counted**
 Total ballots number extracted from the North Carolina Board Of Elections dashboard:
 https://er.ncsbe.gov/
**3.2. State raw data, official federal document 3,789,810 voters who voted**
 Number extracted from the voter history files for 12/03/2022 (4 days following the election certification date of 11/29/2023) which shows a vote cast for each voter.
 >> See data output file named USA-NC-3-02.zip

<span style="background-color:#8B2332;color:white">**DIFFERENCE:**</span> <span style="background-color:#8B2332;color:white">**392 more votes than voters who voted**</span>

**4. Was the number of ballots in error valid according to the Help America Vote Act of 2002?**
**4.1. Apparent voting violations in the 2022 GE according to State BOE raw data…….. 579,496**
**4.2. Allowable machine error rate is 1/10,000,000 ballot positions or 1/125,000 ballots..……. 30**

<span style="background-color:#8B2332;color:white">**DIFFERENCE:**</span> <span style="background-color:#8B2332;color:white">**579,466 errors in excess of legal standard**</span>



## SOME LAWS FORMING THE BASIS OF THIS INQUIRY

The basis of this inquiry is applicable to the following laws. This is not an exhaustive list and other laws protecting the civil rights of the citizens may also apply.

HAVA Sec 303(a)(2)(B)(iii) "The list maintenance performed under subparagraph (A) shall be conducted in a manner that ensures that duplicate names are eliminated from the computerized list."

NC § 163-82.10A.  Permanent voter registration numbers. "The statewide voter registration system shall assign to each voter a unique registration number. That number shall be permanent for that voter and shall not be changed or reassigned by the county board of elections."

NC § 163-182.4 and NC § 163-182.5. Counties certify local elections 10 days after Election Day. The State certifies Federal Elections 3 weeks after Election Day.

HAVA Sec 303(a) The single, uniform, official, centralized, interactive computerized statewide voter registration list... contains the name and registration information of every legally registered voter in the State.

NVRA Sec 8(b) Confirmation of Voter Registration. Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office...

Voting Rights Act of 1965 Sec 11(c). "Whoever knowingly or willfully gives false information as to his name, address, or period of residence in the voting district for the purpose of establishing his eligibility to register or vote, or conspires with another individual for the purpose of encouraging his false registration to vote or illegal voting, or pays or offers to pay or accepts payment either for registration to vote or for voting shall be fined not more than $10,000 or imprisoned not more than five years, or both."

NC § 163-82.3.  Voter registration application forms. Form Developed by the State Board of Elections.
NC § 163-82.4.  Contents of application form. (a)(1) Name.
NC § 163-82.10. Official record of voter registration.
NC § 163-82.16. Change of Name.

NVRA Sec 8(b) Confirmation of Voter Registration. Any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office...

NC § 163-82.7.  Verification of qualifications and address of applicant; denial or approval of application (d) Approval of Application. If the Postal Service does not return the notice as undeliverable, the county board shall register the applicant to vote. *Indicates the date the applicant was registered.

NC § 163-82.10. Official record of voter registration.



NC § 163-82.11. Establishment of statewide computerized voter registration. (d) Role of County and State Boards of Elections. Each county board shall be responsible for registering voters within its county according to the law. Each county board of elections shall maintain its records by using the statewide computerized voter registration system in accordance with rules promulgated by the State Board of Elections. Each county board of elections shall enter through the computer system all additions, deletions, and changes in its list of registered voters promptly to the statewide computer system.

NC § 163-82.12 Promulgation of guidelines relating to computerized voter registration. (3) Interacting with the computerized driver's license records of the DMV and with the computerized records of other public agencies authorized to accept voter registration applications.

H.R. 3295 (107th): Help America Vote Act of 2002
https://www.congress.gov/107/plaws/publ252/PLAW-107publ252.pdf

National Voter Registration Act: Statute at Large 107 Stat. 77 - Public Law No. 103-31 (05/20/1993)
https://www.congress.gov/bill/103rd-congress/house-bill/2/text

Voting System Standards, Vol. 1
https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf

Federal Information Security Modernization Act of 2014
https://www.congress.gov/113/plaws/publ283/PLAW-113publ283.pdf
Originally:
Federal Information Security Management Act of 2002
https://www.congress.gov/107/plaws/publ347/PLAW-107publ347.pdf

EXHIBIT B



# North Carolina's 2022 General Election Validity Scorecard

## ⭐ 1. Were the voter rolls accurate, as required by the National Voter Registration Act of 1993?

| Ineligible or Uncertain Registration Type | Number of Instances * |
|---|---|
| Illegal duplicates | 17,350 |
| Confirmed illegal duplicates | 5,452 |
| Required information incomplete or defective | 11,103 |
| Registered on state holiday or weekend | 326,143 |
| Backdated registrations | 65,895 |
| Altered birthdates | ** 13,371 |
| Older than 111 years old | 1,223 |
| Underage | 92,911 |
| Altered statewide voter registration numbers | ***159,588 |
| Voters with neither SSN nor DL on file | 429,725 |
| **APPARENT REGISTRATION VIOLATIONS:** | **1,122,761** |

## ⭐ 2. Were the votes counted from eligible voters, as required by the US Constitution?

| Ineligible or Uncertain Registration Type that Voted in 2022 GE | Votes cast in 2022 GE**** |
|---|---|
| Illegal duplicates | 3,133 |
| Confirmed illegal duplicates | 1,130 |
| Required information incomplete or defective | 4,414 |
| Backdated registrations | 12,638 |
| Registered after deadline | 157 |
| Altered birthdates | 12,584 |
| Older than 111 years old | 472 |
| Underage | 27,880 |
| Altered statewide voter registration numbers | 1,343 |
| Registered on state holiday or weekend | 207,195 |
| Altered votes | 51,279 |
| Address not verified | 47,206 |
| Unique voter ID with multiple votes | 16 |
| Neither SSN nor driver's license on file | 209,718 |
| Removed records who voted | 331 |
| **APPARENT VOTING VIOLATIONS:** | **579,496** |
| **UNIQUE VOTES IMPACTED BY APPARENT VOTING VIOLATIONS:** | **514,008** |

## ⭐ 3. Was the number of votes counted equal to the number of voters who voted?

| Official Source | Reported Total |
|---|---|
| State Official Results of 2022 GE report | **Ballots counted: 3,790,202** |
| State raw data, official federal document | **Voters who actually voted: 3,789,810** |
| **DIFFERENCE:** | **392 more votes counted than voters who voted** |

## ⭐ 4. Was the number of ballots in error valid according to the Help America Vote Act of 2002?

| | |
|---|---|
| Apparent voting violations in the 2022 GE according to State BOE raw data | 514,008 |
| Allowable machine error rate is 1/10,000,000 ballot positions or 1/125,000 ballots | 30 |
| **Unresolved vote errors: Provable accuracy fails to meet any protective legal standard** | **513,978** |

*"Congress seeks. . . .to guard the election of members of Congress against any possible unfairness by compelling, under its pains and penalties, everyone concerned in holding the election to a strict and scrupulous observance of every duty devolved upon him while so engaged. . . . The evil intent consists in disobedience to the law."* —In re Coy, 127 U.S. 731 (1888)

\* Data extracted from a copy of the North Carolina statewide voter registration database downloaded from the North Carolina State BOE website, as posted on 12/03/2022.
\*\* Data extracted from North Carolina statewide voter registration database files downloaded from the North Carolina State BOE website, posted between 05/13/2017 and 12/23/2023.
\*\*\* Data extracted from a copy of 49 North Carolina snapshot database files downloaded from the North Carolina State BOE website, posted between 1/1/2009 and 1/1/2024.
\*\*\*\* Data records revealed in section one of the scorecard, then compared to historical data extracted from North Carolina statewide voter history database data from the North Carolina State BOE website 12/03/2022.

Unite4Freedom.com ⭐ info@Unite4Freedom.com

© United Sovereign Americans, Inc.

05192024

# EXHIBIT C



# North Carolina's 2022 General Election Validity Reconciliation

| GROUP | DESCRIPTION | REGISTRATIONS | 2022 GENERAL ELECTION VOTES |
|-------|-------------|--------------:|----------------------------:|
| Eligible | Records appear valid so voters are presumed **eligible** to vote. Results can be certified. | 6,564,654 | 3,275,802 |
| Uncertain | Records contain illogical and/or invalid information, so it is **uncertain** whether voters are eligible to vote. Investigation is required before results can be certified. | 768,393 | 432,376 |
| Ineligible | Records appear to violate black letter election laws, so voters are presumed **ineligible** to vote. Investigation is required before results can be certified. | 115,642 | 81,632 |
| **TOTAL** | | **7,448,689** | **3,789,810** |
| Total Votes Certified per official published tallies | | | 3,790,202 |
| **DIFFERENCE (more votes certified than number of votes found in data)** | | | **392 \*\*** |

| | |
|---|---:|
| **Registration Error Rate\*** | **12%** |
| **Vote Error Rate\*** | **14%** |
| **Margin of Victory in NC Congressional District 13** (winner: 143,090/loser: 134,256 votes)\*\*\*\* | **3.18%** |
| **Legal Standard of Allowable Error for Federal Elections\*\*\*** | **0.0008%** |

Unite4Freedom.com ★ info@Unite4Freedom.com          United Sovereign Americans ©2024 All Rights Reserved.          05202024



# North Carolina's 2022 General Election Validity Reconciliation

**The measured error rate of the electoral process in North Carolina, from registration through certification, makes it impossible to legally certify any election in North Carolina.** Whether due to ignorance, arrogance or malice, the error rate simply outstrips the margins of victory. Countless unique investigations were required by law before certification could proceed. Election officials may never be able to prove that those granted the privilege of writing laws for the nation legitimately represented the will of eligible citizen voters.

The registration and voting error rates reported here represent minimums. We have ample reason for concern, after two years of careful study, that the actual error rates are higher.

## 2022 Federal Elections in which the error rate exceeded the margin of victory:

- **US Senate, NC Congressional Districts 1, 6, 9, 11, and 13 — all were impacted**
- **The error rate in the 2022 General Election was 10,000 times the legal standard for system accuracy**
- **All races were impacted by this unacceptably high error rate**
- **38% (273/721) of NC county and municipal races were also within the margin of error; making them statistically uncertifiable**

*\* Ineligible + Uncertain  / totals for both registrations and 2022 GE votes*

*\*\* 392 votes counted are completely unaccounted for in the system. They are not associated with any voter.*

*\*\*\* "This rate is set at a sufficiently stringent level such that the likelihood of voting system errors affecting the outcome of an election is exceptionally remote even in the closest of elections." Voting System Standards, Volume I: Performance Standards. April, 2002, Federal Election Commission, United States of America. The accuracy requirement of the voting system is predicated on the voter rolls being accurate as required by the National Voter Registration Act, 1993.*

*\*\*\*\* Data extracted from the NCSBOE 11/08/2022 OFFICIAL GENERAL ELECTION RESULTS – STATEWIDE -  US House of Representatives District 13*

*Source: 12/03/22 NC BOE Database*

EXHIBIT D

# Richard G. Yost

3652 Jordan Circle                                     919-400-5511 (office)
Franklinton, NC 27525                                  919-381-8770 (cell)
                                                       rick@rickyost.net

**Background Summary**
Bringing 40+ years in Management/Leadership experience with heavy emphasis on information Technology management and support to drive successful, profitable service and product offerings.
Accomplished manager with good business acumen, increasing productivity while reducing costs, managing multi-million dollar budgets, building team consensus and driving planned implementations of projects and service offerings.

## PROFESSIONAL EXPERIENCE

**Information Technology Manager – United Sovereign Americans**             2023 - Current
Executive level manager of all Information Technology aspects for nationwide organization that concentrates on the analytics of state databases throughout the USA.
- Management of data infrastructure components (Servers and software  as well as telecommunications to support the infrastructure.
- Emphasis on management of nationwide programmers resources
- Coordination of software coding efforts to provide consistent data analysis output for conveyance to the federal and state officials.
- Development of data definition tables and structured systems analysis using database software as well as other programming tools to structure clear communications of findings to:
  - State officials
  - Federal reporting to: FBI, DHS, DOJ, SOS

**Information Technology Project Manager – North Carolina Data Team**         2020 - Current
Project Manager of all Information Technology aspects for statewide organization that concentrates on the analytics of NC state databases.
- Development and management of programmer resources throughout the state of NC
- Development of implementation design for database tools and data base table imports
- Defined project goals and tasks to accomplish reporting goals of analytic project of state provided databases.
- Management of resultant data findings to several organizations throughout the state on NC

**Chief Judge – Granville County NC**                                       2023 - Current
Management of elections for the County polls. Responsible for elections under NC  Election laws subchapter 163:
- Management of precinct judges
- Management and scheduling all poll workers
- Accounting for all election ballots and associated documentation
- Reporting of election status
- Development of team and their skills to conduct accurate, secure elections.

SENIOR CONSULTANT      - MERIDIAN CONSULTING & ASSOCIATES, INC.               2015
- Contract consulting support for financial arm of corporate national service providers
- Provide business consulting on large scale hosting systems and all IT infrastructure components
- Recently allowed client to secure $20B Federal health care contract

UNITED STATES POSTAL SERVICE                          SEP 2003 – MAR 2009
MANAGER, HEADQUARTERS COMPUTING INFRASTRUCTURE SERVICES

Executive level Postal Career Executive Service (PCES) Manager - responsible for all computer and telecommunications infrastructure and seat management for campus locations throughout Washington DC metropolitan area.  Also U.S. National Blackberry service manager for the entire USPS infrastructure.
- Reduced required annual budget of $6MM+ to less than $4MM by streamlining computer services, standardizing client and server technologies and eliminating high-cost contractor support.

Case 4:24-cv-00128-M-RJ   Document 1   Filed 08/28/24   Page 68 of 70

3652 Jordan Circle                                                    919-400-5511 (office)
Franklinton, NC 27525                                                 919-381-8770 (cell)
                                                                      rick@rickyost.net

- Implemented a standard printer configuration which reduced costs of printing throughout the USPS HQ campus by more than 30%
- Implemented new IT client and server technology resulting in freeing 10 resources for other mission-critical projects
- Implemented web-based decision analysis application that reduced cellular costs of cellular service providers (AT&T and Verizon) by 25%

AWARDS
- Received 3 Vice President's Special Achievement performance awards
- Received the Vice President's Award for the implementation of the nationwide corporate IT Infrastructure (Associate Office Infrastructure) 2000
- Received the Vice President's Change Agent award for the migration of the corporate Network to a TCP/IP communications protocol 1997

UNITED STATES POSTAL SERVICE                                          AUG 2002 – SEP-2003
**PROGRAM MANAGER – BUSINESS SYSTEMS SOLUTIONS**
- Converted antiquated cc:Mail infrastructure to state of the art email infrastructure on Microsoft Exchange/Outlook, resulting in increased productivity and consistency across the organization, and better customer support.
- Managed team of data center engineers and field implementation personnel delivering eMail conversion project completion on time and within budget.

UNITED STATES POSTAL SERVICE                                          JUL-2001 – AUG-2002
**MANAGER, EBUSINESS INTEGRATION**
Directed Booz-Allen contract resources in feasibility assessment of providing secure electronic communications for the nation resulting in recommendation to table project due to lack of ROI and legal complexities.
- Developed executive skill set resulting in relocation and promotion to Senior Manager, HCIS.

UNITED STATES POSTAL SERVICE                                          JAN-1998 – JUL-2001
**PROGRAM DIRECTOR, ASSOCIATE OFFICE INFRASTRUCTURE**
Directed and managed the implementation of communications (Local Area Network and Wide Area Network) and computer (clients, servers and associated peripheral devices) to 8,000 Postal locations across United States for purpose of building core Information Technology Infrastructure for the USPS
- Managed a $1 billion nationwide project budget, and was accountable directly to the Postmaster General and his management committee.
- Increase the operational efficiency of 8000 postal locations across United States.

UNITED STATES POSTAL SERVICE                                          OCT-1990 – JAN-1998
**PROGRAM MANAGER, SOFTWARE SYSTEMS ADMINISTRATION**
- Managed staff of system software programmers ensuring end user main frame computer application access was continuously provided to all authorized Postal Service employees.
- Led and monitored pilot testing, evaluation and implementation of access method software resulting in continuous improvement of end-user response time to business applications.
- Provisioned systems software that allowed data communications access to USPS mainframe computers and applications at all Postal data centers.
- Converted entire USPS communications software architecture to Transmission Control Protocol/Internet Protocol resulting in:
  - Reduced network cost to the Postal Service, by dismantling the IBM SNA networking infrastructure components and all associated circuits. This established the current Postal Intranet technology currently in use today.
  - Achievement recognized by the industry via feature article in Government Computer News (http://gcn.com/articles/1997/07/28/usps-moves-to-a-tcpip-net.aspx)

UNITED STATES POSTAL SERVICE                                          OCT-1984 – JAN-1990

Case 4:24-cv-00128-M-RJ   Document 1   Filed 08/28/24   Page 69 of 70

# Richard G. Yost

3652 Jordan Circle                                    919-400-5511 (office)
Franklinton, NC 27525                                 919-381-8770 (cell)
                                                      rick@rickyost.net

**COMPUTER ANALYST / SYSTEMS PROGRAMMER**
- Software systems analysis and design to support mail processing and distribution systems productivity reporting and accounting.
- Provided software support for national networking telecommunications computer systems

UNITED STATES POSTAL SERVICE                          OCT-1974 – OCT-1984
**MAIL PROCESSING DISTRIBUTION AND ACCOUNTING AUDITOR**
- Supported regional distribution logistics for mail/package delivery in the north east United States
- Mail Processing productivity analyst auditor for the USPS Northeast region
- Managed USPS Cost Ascertainment system which provided real time data for mail processing / shipping schedule planning
- Shipping and mail processing hands-on experience with shipping dock package handling and all forms of mail processing equipment for all classes of mail services.

## COMPUTER SKILLS
Advanced skills in:  Microsoft Word, PowerPoint, Excel, Project, Visio and Outlook.

PERSONAL DEVELOPMENT
- Executive Management Development Program - Bolger Management Academy, Potomac, MD:
- Information Systems Management & Leadership Development Program - Bolger Management Academy, Potomac, MD
- Project Management Professional (PMP) Certification

PERSONAL Involvement:
- Chief Election Judge – Granville County, NC
- President of Property Owner's Association
- Treasurer, Franklin County Amateur Radio Society
- Certified active NRA firearms instructor
- Member Saint Francis Catholic Church
- Webmaster for local motorcycle club